PEOPLE v MARY LEMONS

PEOPLE v LLEWELLYN LEMONS

Docket Nos. 103265, 103266. Argued December 10, 1996 (Calendar No. 13). Decided May 6, 1997. Rehearing denied in *Mary Lemons, post,* 1220.

Mary C. Lemons and Llewellyn Lemons were convicted by a jury following a joint trial in the Detroit Recorder's Court, A. George Best, J., of three counts each of first-degree criminal sexual conduct against their children who were under the age of thirteen at the time of the events. The Court of Appeals, CONNOR, P.J., and WAHLS, J. (SAAD, J., concurring in part and dissenting in part), in an unpublished opinion per curiam, reversed Ms. Lemons' convictions on the basis that the trial court erred in refusing to instruct the jury on duress and second-degree criminal sexual conduct. The Court affirmed Mr. Lemons' convictions, but reversed his two sentences of sixty to ninety years as excessive under *People v Moore,* 432 Mich 311 (1989), in light of his age, despite having concluded the sentences were proportionate (Docket Nos. 159598, 159599). The people appeal.

In an opinion by Justice BOYLE, joined by Chief Justice MALLETT, and Justices RILEY and WEAVER, the Supreme Court *held:*

In *Mary Lemons,* because the defense did not establish a prima facie case of duress, an instruction on duress was not required. Nor was an instruction on second-degree criminal sexual conduct required because it would have been inconsistent with the evidence and the defendant's theory of the case. In *Llewellyn Lemons,* the sentences were not excessive under *Moore* and were proportionate to the offense and the offender under *People v Milbourn,* 435 Mich 630 (1990).

1. In raising the defense of duress, the defendant has the burden of producing some evidence from which the jury can conclude that the threatening conduct was present, imminent, and impending; that it was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm; that it in fact caused such fear and was operating on the mind of the defendant at the time of the alleged act; and that the act was committed to avoid the threatened harm. In *Mary Lemons,* the defense did not meet the

burden of producing a prima facie defense of duress, and, thus, an instruction on duress was not required.

2. Regardless of the evidence offered in a given case, the court must instruct the jury on necessarily included lesser offenses. With regard to cognate offenses, however, the evidence must be reviewed to determine if it would support a conviction of the cognate offense. The requested instruction on a cognate offense must be consistent with the evidence and the defendant's theory of the case, and will be required if there is a dispute in evidence that would support a conviction of that charge. Second-degree criminal sexual conduct is a cognate lesser offense of first-degree criminal sexual conduct. In *Mary Lemons*, the trial court did not err in determining that the second-degree criminal sexual conduct conviction would be inconsistent with the evidence and the defendant's theory of the case.

3. Where a sentence falls within the permissible range of sentences for a defendant's conviction and is indeterminate, the sentence is lawful as long as it meets the requirements of proportionality under *Milbourn*. *Milbourn* does not require a trial judge to tailor every sentence in relation to a defendant's age. In *Llewellyn Lemons*, the sentences imposed were not excessive under *Moore* and were proportionate to the offense and the offender under *Milbourn*.

*People v Mary Lemons*, reversed.

*People v Llewellyn Lemons*, reversed.

Justice CAVANAGH, joined by Justice BRICKLEY, concurring in part and dissenting in part, stated that with respect to Llewellyn Lemons' appeal, the majority ignores the fundamental and most important operative distinction between parolable and nonparolable offenses and condones the sentencing court's abuse of discretion in fashioning these challenged sentences. Given that Mr. Lemons received a valid life sentence on a separate but related count, the only conceivable rationale for sentencing him to two terms of sixty to ninety years was to effectively prevent the parole board from assuming jurisdiction over him pursuant to MCL 791.234(4); MSA 28.2304(4). A sentence fashioned for the sole purpose of depriving the parole board of its legislatively provided jurisdiction constitutes an abuse of a sentencing court's discretion.

Pursuant to MCL 791.233b(w); MSA 28.2303(3)(w), criminal sexual conduct in the first degree is a parolable offense. A prisoner is subject to the jurisdiction of the parole board after serving the minimum term less available disciplinary credits, compelling the Supreme Court to invalidate any sentence fashioned solely for the purpose of precluding parole board jurisdiction over a prisoner.

Being subject to the jurisdiction of the parole board and actually being paroled are two distinctly different prospects. Few prisoners serving parolable life sentences are ever paroled.

Justice KELLY took no part in the decision of this case.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Janice M. Joyce Bartee*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gail Rodwan*), and *Maria Mannarino* for the defendants.

BOYLE, J. We granted leave to appeal in *People v Mary Lemons* to decide whether defendant Mary Cadry Lemons was entitled to a jury instruction on duress where her defense was that the charged offenses never occurred,[1] and whether she was entitled to an instruction on criminal sexual conduct in the second degree. We granted leave in *People v Llewellyn Lemons* to decide whether defendant Llewellyn Lemons' sentence of sixty to ninety years was lawful where defendant was forty-five years old at sentencing.

We reverse the decisions of the Court of Appeals in both cases. We reinstate Ms. Lemons' convictions and Mr. Lemons' sentences.

### I. FACTS AND PROCEEDINGS

The defendants each were convicted of three counts of first-degree criminal sexual conduct[2]

---

[1] MCL 769.9; MSA 28.1081.

[2] MCL 750.520b; MSA 28.788(2).

against their children.[3] They each were charged with four counts, but, just before trial, the prosecutor dismissed counts VII and VIII.[4] Ms. Lemons was convicted of three counts of receiving cunnilingus, one count involving her son (Mr. Lemons' stepson), and the other two involving her stepdaughter (Mr. Lemons' younger daughter). Mr. Lemons was convicted of one count of fellatio with each victim and, on an aiding and abetting theory, of one count of cunnilingus performed by his daughter on his wife. The aggravating factor making the crime CSC I was that both children were under the age of thirteen at the time of the events.

A

The testimony in this case came from the victims, as well as Mr. Lemons' older daughter. Mr. Lemons' younger daughter, who was eighteen at the time of trial, testified that the sexual abuse began in 1980 when she was five or six, before Ms. Lemons and her son moved in with Mr. Lemons and his daughters.[5] The witness testified that her father showed her a pic-

---

[3] The defendants sexually abused Ms. Lemons' son from a previous relationship, who was five years old at the time of the first incident, and Mr. Lemons' daughter from a previous relationship, who was also five years old at the time of the first incident of abuse. At the time of trial, the son was thirteen years old and the daughter was seventeen.

[4] Apparently, the victim in these counts, who was the son of both defendants, was unwilling to testify against his parents. However, at sentencing, the trial judge stated:

I want the record to reflect as . . . a consideration and not that I'm specifically basing any sentence on this . . . the youngest child that had two counts dismissed [had] such severe rectal deformity that he cannot maintain normal bowel movements . . . .

[5] The jury was instructed not to consider against Ms. Lemons' acts that occurred before she and Mr. Lemons began living together.

ture of a woman "performing oral sex on a man" in a
magazine and convinced her to perform the act in the
picture by telling her he was "low on [his magic]
power" and would die if she did not.[6] Mr. Lemons
ordered her to continue, pushing her "head down on
him," even after she vomited.[7] The older sister, who
was ten at the time of the incident, testified that her
father had called her into the bedroom first and had
shown her a picture of people having oral sex, which
he said he needed for energy. When she refused, her
father told her to go back to the living room and to
send in her younger sister, which she did.

The evidence indicated that there were multiple
acts of physical and sexual abuse of Mr. Lemons'
younger daughter over a period of years from 1980 to
1988 when, at age thirteen, she ran away. She testi-
fied, without objection, that she performed "oral sex"
on both defendants and that she observed Ms. Lem-
ons' son performing "oral sex" on his mother and on
Mr. Lemons.[8] She further testified about the cunnilin-
gus, that Mr. Lemons ordered her to "do it to Mary,"
and that she put her face "down there [on Mary's]
vagina." She also said it happened "[n]ot very many"
other times. She testified with regard to Ms. Lemons'
involvement:

> Q. . . . Do you think that [your step mother] did it
> because she wanted to, or was she forced?

---

[6] At this time father and daughters slept in the same bed.

[7] The two daughters' testimony regarding these events corroborated
one another.

[8] It is sufficient for our purposes to know that Mr. and Ms. Lemons
were living together in 1985 with the children who were abused and three
or four others who were born during the Lemons' relationship.

*A.* When all this started it was all new to her. She never done anything like . . . that before. And then *at the beginning* he forced her, and it wasn't me. I wasn't the first one. [My stepbrother] was, for her.

*Q.* All right. To perform oral sex on Mary?

*A.* Exactly.

\*       \*       \*

*Q.* Okay. Go ahead. Then what?

*A.* Then, you know, I mean the first time, all she said was "Lue." *She didn't, she didn't object, she didn't try to stop it. And she slapped me. She was like provoking the situation. She was not trying to help me at all. She wasn't trying to stop it. She was making me do it.* [Emphasis added.]

The only other incident involving Mr. Lemons' older daughter occurred some time after Ms. Lemons moved in. Ms. Lemons was sitting naked in the living room and Mr. Lemons attempted to coax his older daughter to "touch it." She refused and was never involved in subsequent acts of abuse. She ran away when she was sixteen because Mr. Lemons was beating her and the other children, making her fight Ms. Lemons with sticks, and ordering Ms. Lemons to beat her. There was evidence that Mr. Lemons beat Ms. Lemons on a number of occasions, once pushing her through a glass window, and that Ms. Lemons generally feared Mr. Lemons.

B

Ms. Lemons' son, who was thirteen at the time of trial, testified that when he was five and thereafter, Mr. Lemons forced him to "suck his penis" more than once while Ms. Lemons was in the room and did not protest. Mr. Lemons also ordered him to "lick [his] mother's vagina." Ms. Lemons' son also testified that

his mother forced him to perform this act once when
Mr. Lemons was not present. Ms. Lemons' son also
performed oral sex on Mr. Lemons' younger daughter.

Both children were sometimes involved with sex
with the parents at the same time in the living room,
which was used as the parents' bedroom. Both chil-
dren observed the other performing sexual acts on
their parents. Abuse of Ms. Lemons' son continued
until 1991 when Protective Services intervened at the
request of one of the older children; however, Ms.
Lemons did not participate for two years in the abuse
of her son because he would bite or pull away or
"wouldn't do it right." The evidence adduced at trial
revealed no repercussions against Ms. Lemons for her
refusal to participate.

C

Ms. Lemons and the children also testified that Mr.
Lemons was an alcoholic who beat them all regularly.
The parents forced the children to kneel on uncooked
rice as a punishment, sometimes for hours. Mr. Lem-
ons and Ms. Lemons disciplined the children by beat-
ing them over different parts of their bodies with "Mr.
Butt Stick," a stick approximately eighteen inches
long and 1.5 inches thick with a drawing of a face and
the words "Butt Stick" on it.[9] The parents also admit-
ted disciplining Ms. Lemons' son by locking him in
the basement overnight.

The record indicates Ms. Lemons left the household
with the children at least twice. She testified that she
returned each time because she feared becoming a

---

[9] Ms. Lemons' son testified that she drew the picture. Mr. Lemons
admitted at trial to beating the children.

welfare mother. The record does not reveal that she suffered any repercussions for leaving.

Mr. Lemons' older daughter testified that Mr. Lemons told them that he was a god, and that they were demons. He forbade them to attend church because they would only hear lies there. At trial, Mr. Lemons' younger daughter testified that Ms. Lemons' son wished Mr. Lemons and Ms. Lemons would die, but that she wanted them to live so they would suffer like they made her suffer because "death is too good for them."[10]

D

The defendants both testified and denied that any sexual abuse took place in their household. They accused the victims of fabricating the charges to get back at Mr. Lemons for being a strict disciplinarian. At the end of the trial, counsel for Ms. Lemons requested an instruction on duress. The trial judge refused to give the instruction because Ms. Lemons' testimony, consistent with her theory of the case, denied the acts ever occurred. Counsel also requested an instruction on CSC II[11] for the counts regarding cunnilingus by Mr. Lemons' daughter, arguing that the jury could construe the girl's testimony to establish either oral contact or facial contact.[12] The judge

---

[10] The record reflects that the defendants were laughing while this testimony was being offered, and the judge reprimanded them for it out of the presence of the jury.

[11] MCL 750.520c; MSA 28.788(3).

[12] Counsel's argument that facial contact alone was insufficient to constitute CSC I through cunnilingus, and that because the testimony could be construed to describe facial contact alone, it created a jury question about whether the acts amounted to CSC I or CSC II, overlooks the fact that the witness testified, without objection, that she performed "oral sex."

rejected the instruction as inconsistent with the evidence. Mr. Lemons expressly informed the court that he did not want any instructions on offenses other than CSC I.

The jury convicted both defendants on all counts. Detroit Recorder's Court Judge A. George Best sentenced Ms. Lemons to one life term and two terms of 50 to 80 years' imprisonment. The judge sentenced Mr. Lemons to one life term and two terms of 60 to 90 years' imprisonment.

The Court of Appeals, in an unpublished per curiam opinion, reversed Ms. Lemons' convictions on the basis that the trial court erred in refusing to instruct the jury on duress and CSC II. The Court affirmed Mr. Lemons' convictions, but reversed his two sentences of 60 to 90 years as excessive under *People v Moore*, 432 Mich 311; 439 NW2d 684 (1989), in light of the defendant's age, despite its having concluded the sentences were proportionate. The prosecutor appealed, and we granted leave to appeal. 450 Mich 993 (1996). We reverse the decision of the Court of Appeals and reinstate Ms. Lemons' convictions and Mr. Lemons' sentences.

## II. *PEOPLE v MARY CADRY LEMONS*

### A. DURESS INSTRUCTION

Ms. Lemons testified at trial and denied that any acts of sexual abuse took place in her household. On direct examination, the focus of her testimony was her relationship with her husband and its attendant physical abuse. She testified that throughout their relationship, which began in 1981 and resulted in a marriage in 1982, Mr. Lemons' behavior and alcohol abuse gradually worsened.

Ms. Lemons testified that the physical abuse began with grabbing and progressed to open-handed slapping and later full-fledged beating with fists.[13] She also testified that she was forced or intimidated by Mr. Lemons to do things she did not want to do, including "disciplin[ing] the kids right or . . . clean[ing] the house the way he wanted it, or it just didn't matter what." Mr. Lemons' "total control" resulted in physical bruises as well as fear of Mr. Lemons and low self-esteem. Ms. Lemons tried to leave at least twice, but she returned both times out of fear that she, as "a worn out old lady with a bunch of kids[,] . . . would end up being a welfare mom."

On cross-examination she testified specifically regarding the alleged sexual abuse:

> *Q.* Ma'am, did you see Mr. Lemons involved in any type of sexual abuse with either [child]?
> *A.* No, I did not.
> *Q.* Never?
> *A.* Never.
> *Q.* You're going to tell this jury, ma'am, that [your stepdaughter] sat up on that stand and lied?
> *A.* Yes.
> *Q.* You're going to tell this jury, ma'am, that you never forced [your stepdaughter] or sat there for [her] to put her face into your vagina?
>
> \*     \*     \*
>
> *A.* Correct.
> *Q.* She lied about that?
> *A.* Yes.
> *Q.* You never forced [your son] to lick your vagina?

---

[13] On one occasion, Mr. Lemons pushed her through a window and pulled her back.

*A.* I never did.

*Q.* [He] never licked your vagina, ma'am?

*A.* Correct.

*Q.* There was no sexual abuse going on in that home at all; is that correct, ma'am?

*A.* Yes.

The defendant requested a jury instruction on duress on the theory that the jury was free to disbelieve Ms. Lemons' testimony, credit the testimony of the prosecutor's witnesses, and find that Mr. Lemons forced Ms. Lemons to sexually abuse the children. The trial judge denied the request, ruling that Ms. Lemons' testimony was "in direct conflict with what seems to be predicated in the CJI for using a duress defense."

The Court of Appeals reversed, explaining its decision as follows:

> [T]he trial court erred by refusing to give a requested jury instruction on duress where there was evidence to support the defense, and the trial court's refusal did not sufficiently protect her rights or present the issues to be tried. . . .
>
> Jury instructions must not exclude material issues, defenses, and theories if there is evidence to support them. . . . [Ms. Lemons] offered some evidence from which a jury could conclude that [Mr. Lemons'] threatening conduct would cause in the mind of a reasonable person, and did cause in the mind of [Ms. Lemons], a fear of death or serious bodily harm; the fear or duress was operating on the mind of [Ms. Lemons] at the time of the alleged acts; and she committed the acts to avoid the threatened harm. [Unpublished opinion per curiam, issued May 26, 1995 (Docket Nos. 159598, 159599), slip op at 2-3.]

Judge SAAD, dissenting, stated:

For the trial court to have instructed the jury that [Ms. Lemons] could be found not guilty of her participation in these disgusting crimes because she may have been "coerced" or under "duress," in light of the overwhelming evidence of her complicity and a total absence of testimony of duress, does violence to common sense. [*Id.*, slip op at 2.]

We agree. The right of defendants to raise inconsistent defenses, MCR 2.111(A)(2), is not unlimited. *People v Kirk*, 151 Mich 253; 114 NW 1023 (1908). In *Kirk*, the trial court refused to instruct on intoxication as a defense to the specific-intent requirement of the crime charged where the defendant also argued self-defense. This Court stated that "the jury should have been instructed . . . [on intoxication] if there was testimony which would warrant a jury in saying that the intoxication of respondent was of a degree which rendered [the respondent] incapable of entertaining the intent charged." *Id.* at 258. However, the case was not reversed on these grounds because, as the defendant explains in her brief, the intoxication defense "was not sufficiently supported in the record of the *Kirk* case."[14]

Duress is a common-law affirmative defense. MCR 2.111(F)(3)(a); *United States v Bailey*, 444 US 394, 415; 100 S Ct 624; 62 L Ed 2d 575 (1980); 21 Am Jur 2d, Criminal Law, § 148, p 288; 22 CJS, Criminal Law,

---

[14] More recently we have applied this principle to a request for an accident instruction in *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995), where we observed:

[W]hen a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge. . . . A trial court is required to give a requested instruction, except where the theory is not supported by evidence.

§ 52, p 64.[15] It is applicable in situations where the crime committed avoids a greater harm. The reasons underlying its existence are easy to discern:

> The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person. [1 LaFave & Scott, Substantive Criminal Law, § 5.3, pp 614-615.]

In order to properly raise the defense, the defendant has the burden of producing "some evidence from which the jury can conclude that the essential elements of duress are present." CJI2d 7.6, *commentary*. In *People v Luther*, 394 Mich 619, 623; 232 NW2d 184 (1975),[16] we held that a defendant successfully carries the burden of production where the defendant

---

[15] "An affirmative defense is one that admits the doing of the act charged, but seeks to justify, excuse, or mitigate it . . . ." 21 Am Jur 2d, Criminal Law, § 183, p 338. It does not "negate selected elements or facts of the crime." 22 CJS, Criminal Law, § 52, p 64.

[16] We recognize that our decision in *People v Luther* has been criticized, in part, for referring to duress as a defense that negates the intent element, *id.* at 622, rather than as an affirmative defense that justifies or excuses despite the presence of all the elements. See LaFave & Scott at 615, n 4. To the extent *Luther* stated that duress "acknowledg[es] the will to do the act complained of but seek[s] to excuse it," *id.* at 622, its reasoning correctly implied that the defense is an affirmative defense, and we would not hold otherwise.

Although there has been disagreement among authorities with regard to this issue, cf. *State v Riker*, 123 Wash 2d 351; 869 P2d 43 (1994) (requiring the defendant to prove duress by a preponderance of the evidence), with *People v Graham*, 57 Cal App 3d 238; 129 Cal Rptr 31 (1976) (holding duress negates the voluntary-act requirement), we are persuaded that the correct view is that "even though [the defendant] has done the act the crime requires and has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude." LaFave & Scott, *supra* at 615.

introduces some evidence from which the jury could conclude the following:

> A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;
>
> B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;
>
> C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and
>
> D) The defendant committed the act to avoid the threatened harm.[17]

Additionally, in *People v Merhige*, 212 Mich 601, 610-611; 180 NW 418 (1920), we acknowledged that the threatening conduct or act of compulsion must be "present, imminent, and impending[, that] [a] threat of future injury is not enough," and that the threat "must have arisen without the negligence or fault of the person who insists upon it as a defense."[18]

While this Court has had only a few occasions in which to address the defense, federal precedent is instructive.[19] In *Bailey*, the United States Supreme Court observed that the defense requires "that the

---

[17] In other words, to raise the affirmative defense of duress, the defendant must offer evidence that the prohibited act was done under circumstances that excuse its commission.

[18] Additionally, LaFave and Scott identify factors that may cause a defendant to forfeit the defense of duress, i.e., where the defendant "does not take advantage of a reasonable opportunity to escape, where that can be done without exposing himself unduly to death or serious bodily injury," and where the defendant "fails to terminate his conduct 'as soon as the claimed duress . . . ha[s] lost its coercive force.' " *Id.* at § 5.3, pp 619-620.

[19] The prima facie elements required to establish the defense in federal courts are substantially similar to those required in Michigan:

> (1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and (3) lack

testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense . . . ." *Id.* at 415. In other words, "[b]efore a defendant is entitled to an instruction on the defense of duress, he must establish a *prima facie* case of the . . . elements of that defense . . . ." *United States v Beltran-Rios*, 878 F2d 1208, 1213 (CA 9, 1989).[20] The defendant is required to produce some "evidence on all of the elements of the defense of duress." *United States v Patrick*, 542 F2d 381, 388 (CA 7, 1976). "Unless a defendant submits sufficient evidence to warrant a finding of duress, the trial court is not required to instruct the jury on that defense."[21] *United States v Mitchell*, 725 F2d 832, 837 (CA 2, 1983).

The right to assert inconsistent defenses notwithstanding, Ms. Lemons' defense at trial did not meet

---

of a reasonable opportunity to escape the threatened harm. [*United States v Beltran-Rios*, 878 F2d 1208, 1213 (CA 9, 1989).]

[20] Prima facie evidence is:

Evidence good and sufficient on its face. Such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient . . . to sustain a judgment in favor of the issue which it supports . . . . [Black's Law Dictionary (6th ed), p 1190.]

[21] Because Ms. Lemons failed to carry her burden of production, we need not address here the issue whether the prosecution must disprove at least an element beyond a reasonable doubt once the defendant satisfies his burden of production, or if the defendant also bears the burden of persuasion on the defense by a preponderance of the evidence. We observe, however, that due process is not offended where the state places the burden of persuasion on the defendant with respect to an affirmative defense such as insanity. *Leland v Oregon*, 343 US 790, 797-798; 72 S Ct 1002; 96 L Ed 1302 (1952); see also *Mullaney v Wilbur*, 421 US 684; 955 S Ct 1881; 44 L Ed 2d 508 (1975).

the burden of producing a prima facie defense of duress. As discussed above, Ms. Lemons' defense focused on her husband's physically abusive nature.[22] Her testimony on direct examination established that she had been beaten by Mr. Lemons, that she feared him, and that he was in control of the household. It also established that she left and returned to Mr. Lemons at least twice. On cross-examination, she unequivocally denied that any sexual abuse took place at any time in the household. We conclude that, as in *Kirk*, these facts are legally insufficient to require the requested instruction. They do not, standing alone, meet the burden on the defense to come forward with some evidence that the defendant did the act and chose to do so out of a reasonable and actual belief that it was the lesser of two evils.

The testimony offered in support of the defense foreclosed the trial judge from finding that the burden of production had been met, i.e., that the prohibited act was committed by the defendant and was done by her to avoid harm, and that the fear of harm was operating on her mind at the time of the act.[23] Her testimony offered nothing with regard to the immedi-

---

[22] This is not an appropriate case to rely on battered spouse syndrome to explain Ms. Lemons' actions because the defense never attempted to explicitly assert that defense at trial or on appeal. See *People v Christel*, 449 Mich 578; 537 NW2d 194 (1995).

[23] The only evidence even remotely related to this prima facie requirement came from Mr. Lemons' younger daughter when she testified that Mr. Lemons "forced" Ms. Lemons "at the beginning." However, in almost the same breath she testified that with regard to the acts of cunnilingus with her, Ms. Lemons "slapped" her and "was . . . provoking the situation," and that "all she said was 'Lue.' She didn't, she didn't object, she didn't try to stop it." We agree with the trial judge that this evidence was insufficient to permit a finding that immediate harm was threatened that created a reasonable fear and required the acts of sexual abuse to avoid the threatened harm.

acy of any specific threat as it related to any specific act of sexual abuse. Thus, the evidence failed to satisfy the burden of production of a prima facie claim that fear was operating on Ms. Lemons' mind at the time of the alleged acts or that she reasonably felt she would suffer some harmful repercussions for failing to sexually abuse the children.[24] At most the evidence offered by the defendant supported a contention that the relationship between the defendants was physically and emotionally abusive and that Ms. Lemons was "brain washed" through lack of self worth. The defense did not link Ms. Lemons' fear of Mr. Lemons, either generally or specifically, to the alleged acts of sexual abuse.[25] Thus, while it is true that "when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge," *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995), the defendant here failed to successfully raise the prima facie defense of duress in accordance with *Luther, supra*. Because a jury question was not presented, the instruction was not required. *Mills* at 81.

Consistent with trial counsel's arguments in support of the duress instruction, Ms. Lemons' counsel

---

[24] In fact, the evidence offered by the prosecution, which was rebutted only by Ms. Lemons' denials, was directly contrary to the establishment of any such element, in that Ms. Lemons' son testified (1) that he was forced to perform oral sex when Mr. Lemons was not present, and (2) that Ms. Lemons refused to engage in any sexual act with her son for two years without suffering any consequences from Mr. Lemons. In light of these facts, had the instruction been required, we would conclude its omission was harmless error, in that the prosecutor's evidence sufficiently rebutted the elements of the defense.

[25] A fortiori, the defense presented no evidence from which the jury could conclude that the acts were themselves committed under duress, that is, that Ms. Lemons was justified in her fear of a threat of death or serious bodily harm that was "operating at the time of the alleged act."

argues on appeal that a duress instruction should have been given because the jury could have disbelieved Ms. Lemons' testimony and credited the testimony regarding abuse and intimidation of Ms. Lemons by Mr. Lemons. This would be true, however, only to the extent that the defense could make a showing sufficient to allow the jury to conclude not only that a reasonable person would have feared death or serious bodily harm, but also that Ms. Lemons violated the law because she was in fact actually coerced to do so. The defendant, without offering other evidence to support a critical element of the affirmative defense, explicitly denied that the act ever occurred,[26] thus negating any claim that acts were justified by her actual fear. Since she failed to provide a basis for the jury to find that the acts were committed by her to avoid a greater harm,[27] tendering the duress instruction would have permitted the jury to engage in speculation.

Finally, in light of all the evidence offered in Ms. Lemons' case, we agree with Judge SAAD that tendering the instruction on duress would defy common sense. There was testimony by both victims that she ordered them to perform acts of oral sex. She slapped her stepdaughter for doing it "wrong," and she engaged her son in the activity when Mr. Lemons was

---

[26] The parties have not briefed the question whether sexual abuse of a child may be justified by duress.

[27] The situation might be different if a defendant testified he had no memory and another witness testified that another person was holding a gun to the defendant's head when he took the money from the victim's cash register. While it is true that an inconsistent defense does not necessarily stand in the way of presenting an affirmative defense, the defendant must produce the evidentiary basis for the defense in order to require the court to tender an instruction.

not immediately present. She offered no evidence that she suffered repercussions when she refused to abuse her son for a period of two years or when she left the household and returned. She failed to assert that some greater harm was avoided by the sexual abuse, and the evidence indicates she voluntarily reentered the household and continued to engage in the sexual abuse.

Because Ms. Lemons failed to carry the burden of production by offering some evidence on each element, we reverse the Court of Appeals determination that the trial court erred in refusing to instruct the jury on this defense.

### B. CSC II INSTRUCTION

Mr. Lemons' younger daughter testified that she performed oral sex on her stepmother. She also said it happened "[n]ot very many" other times. Ms. Lemons requested a jury instruction on CSC II on the basis of this testimony, claiming it was insufficient to establish cunnilingus for purposes of CSC I.[28] The trial judge refused the instruction because he had refused a motion for a directed verdict on the same grounds, stating that "oral contact is sufficient for cunnilingus. [It] [d]oes not require any specific use of a mouth or the tongue as long as there is contact."

The Court of Appeals reversed the decision of the trial court, stating, "The trial court erred in refusing to give an instruction for the CSC [II]. Upon retrial, the

---

[28] Counsel argued that the CSC I cunnilingus requires "some sort of specific testimony indicating some kind of oral sexual act, such as lips or tongue or vaginal area or licking or something to that effect in order to establish cunnilingus," but that the evidence only established facial contact "without any further description."

trial court will instruct the jury on [CSC II] if requested. . . . [Ms. Lemons'] two convictions with respect to the charges involving [her stepdaughter] are reversed, and we remand for entry of judgment of conviction of two counts of [CSC II] and resentencing, with the option to the prosecutor to retry [Ms. Lemons] on the original charges of [CSC I]." Slip op at 3-4.

Just last term, we addressed the governing rule regarding when a court is required to instruct the jury on lesser included offenses. In *People v Bailey*, 451 Mich 657, 667-668; 549 NW2d 325 (1996), we observed:

> When reviewing the propriety of a requested lesser included offense instruction, we first determine if the lesser offense is necessarily included in the greater charge, or if it is a cognate lesser included offense. Necessarily included lesser offenses "must be such that it is impossible to commit the greater without first having committed the lesser." . . . Cognate lesser included offenses "are related and hence 'cognate' in the sense that they share several elements, and are of the same class or category, but may contain some elements not found in the higher offense."

CSC I requires the prosecutor to prove "sexual penetration." MCL 750.520b(1); MSA 28.788(2)(1). CSC II requires the prosecutor to prove "sexual contact." MCL 750.520c(1); MSA 28.788(3)(1). Sexual penetration can be for any purpose. MCL 750.520a(l); MSA 28.788(1)(l). The statute defines sexual contact, however, as touching that "can reasonably be construed as being for the purpose of sexual arousal or gratification." MCL 750.520a(k); MSA 28.788(1)(k). Thus, because CSC II requires proof of an intent not required by CSC I—that defendant intended to seek sexual arousal or gratification—CSC II is a cognate lesser

offense of CSC I. In short, it is possible to commit CSC I without first having committed CSC II.[29]

Regardless of the evidence in a given case, the court must instruct the jury on necessarily included lesser offenses. *People v Heflin*, 434 Mich 482, 495; 456 NW2d 10 (1990). With regard to cognate offenses, however, the evidence must be "reviewed to determine if it would support a conviction of the cognate offense." *Bailey* at 668. The requested instruction on the cognate offense must be consistent "with the evidence and defendant's theory of the case." *Heflin* at 499. The instruction on a cognate offense will be required if there is a dispute in evidence that would support a conviction of that charge. *Bailey, supra* at 661.

The trial judge did not err in determining that the CSC II conviction would not be consistent with the evidence and the defendant's theory of the case. The evidence offered by the prosecution established that Ms. Lemons engaged in multiple acts of cunnilingus with her son and stepdaughter. Although we have found that penetration for the purpose of establishing fellatio requires actual penetration rather than mere kissing or contact where the defendant is engaging in contact with a child's penis, *People v Johnson*, 432

---

[29] Like the Court of Appeals in *People v Garrow*, 99 Mich App 834, 839-840; 298 NW2d 627 (1980), "[w]e recognize that in most cases, second-degree [CSC] is a factually included offense within first-degree [CSC], for sexual penetration is usually for a sexual purpose." However, the additional intent requirement for CSC II mandates that it be considered a cognate lesser offense of CSC I. Similarly, in *Bailey, supra*, we held that assault with intent to commit great bodily harm is a cognate lesser offense of second-degree murder because although the intent necessary to commit the lesser offense "is sufficient to meet the required mens rea for second-degree murder, the greater crime can also be committed with different mental states than intent to inflict great bodily harm." *Id.* at 669.

Mich 931 (1989), the distinction is illogical where the victim testifies without objection that she performed oral sex and placed her face on the defendant's vagina. The only reasonable interpretation of this testimony, which was not brought into question by any cross-examination creating a dispute of fact, is that it was intended to be cunnilingus, which, by definition, does not require penetration.

The distinction advocated by the defendant would be contrary to the policy of the act and would discourage child victims from testifying by requiring them to describe explicitly the method by which they performed cunnilingus. Testimony that a child victim performed oral sex and placed her face into the vaginal area of an adult does not raise a dispute on an element distinguishing the cognate offense from the principal charge.

We reverse the Court of Appeals determination that the trial court erred by refusing to instruct the jury on CSC II.

### III. DEFENDANT LLEWELLYN LEMONS

Mr. Lemons was sentenced to one life term and two terms of 60 to 90 years.[30] In deciding to depart from the sentencing guidelines recommendation of 180 months or 360 months to life, Judge Best offered the following:

> I believe that this is the most heinous crime a parent can commit against a child. It doesn't rise to the level of murder but it's a killing of another kind. You've killed their

---

[30] The trial judge specifically ordered that if the defendants ever become eligible for parole, he or his successor judge is to be notified so that the court may exercise its right to comment on the case to the parole board.

trust . . . their faith . . . their family, you have destroyed
a big part of their future and that was your choice; you
didn't have to do it.

\*      \*      \*

I believe that neither of you can be [rehabilitated]; that
you will be a danger to society . . . if . . . released . . . and
I am concerned.

\*      \*      \*

I think the guidelines are not adequate for this type of
offense . . . I believe that this type of situation was never
and indeed could never be envisioned by the peo-
ple . . . coming up with these guideline ranges. I can't
imagine in their wildest dreams they anticipated a case like
this . . . those numbers are simply incorrect . . . the con-
duct . . . was extraordinary in nature and beyond the
anticipated range of behavior treated in the guidelines . . .
the special circumstances of the offense . . . [and] offender
require a significant departure . . . . [T]he guidelines . . .
are inadequate, . . . inappropriate, . . . [and] not sufficient
. . . .

\*      \*      \*

I sat through this trial. I saw the children testify. I saw
their emotion. You could feel the pain and the anger. For
[Ms. Lemons' son] to say that if he could, he would pull the
switch himself, I think is understandable. For [Mr. Lemons'
younger daughter] to indicate that death is too good a pun-
ishment I think is understandable. And I think any court
reviewing this trial or this sentence ought to understand
that looking at a transcript is not sufficient to understand
the emotion and the truth of what was conveyed by those
children when they testified.

The Court of Appeals reversed the trial court's sen-
tence, and remanded Mr. Lemons' case for resentenc-
ing. It reasoned as follows:

[W]e find the sentences proportionate and the departures from the guidelines justified. The heinousness of the crimes was not reflected in the guidelines . . . . The departures . . . were also justified by the existence of other serious, uncharged offenses which were established at trial.

However, although [Mr. Lemons'] sentences of 60 to 90 years may be proportionate to the offense, they are excessive with respect to the offender in light of his age of 45 years at the time of sentencing. . . . [He] would be more than 96 years old at the completion of his sentences. . . . Thus, we find it necessary to remand for resentencing . . . in accord with . . . *People v Moore* . . . . [Slip op at 2.]

We agree with the Court of Appeals that the sentences were proportionate, but we reverse its finding that they were excessive under *Moore* because of the defendant's age at sentencing. *Moore* was decided before *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), and *People v Merriweather*, 447 Mich 799; 527 NW2d 460 (1994), which provide the standards for reviewing a sentence on appeal. These sentences are clearly governed by *Milbourn* and *Merriweather.*

In *Merriweather*, the defendant committed unspeakably atrocious acts of torture and sexual abuse against an eighty-four-year-old woman in her home. *Id.* at 802-804. He was convicted of two counts of CSC I and sentenced to 60 to 120 years' imprisonment for those convictions. On appeal, the defendant argued that the indeterminate sentencing act requires that where the authorized maximum sentence is "life or for any term of years," as is the case for CSC I, "the judge must either impose a low sentence or else give 'life,' which would make the defendant eligible for parole after" a statutorily determined number of

years.[31] *Id.* at 808-809. We rejected that argument and found "no basis . . . to conclude that the Legislature intended that all defendants . . . must be eligible for parole." *Id.* at 809.

Our decision in *Merriweather* makes clear that where a sentence "falls within the permissible range of sentences for defendants convicted of [CSC I]," which is "for life or for any term of years," MCL 750.520b(2); MSA 28.788(2)(2), and is indeterminate, because the judge fixes both the minimum and the maximum, the sentence is lawful as long as it meets the requirements of proportionality under *Milbourn*. With regard to parole eligibility we ob-served:

> The fact that it is paradoxical that the defendant might be better off with a sentence of life, which would make him eligible for parole, has nothing to do with a legislative intention that every prisoner should be eligible for parole. The Legislature has not seen fit to interfere with the voters' directive that a defendant should not be parole eligible until the completion of the minimum term.
>
> \*          \*          \*
>
> Assuming arguendo, "the only possible rationale for sentencing the defendant . . . was to effectively prevent the parole board from assuming jurisdiction," . . . , that is the precise result the electorate sought and obtained in the passage of Proposal B. [*Merriweather, supra* at 809-811.]

In short, we find no basis in *Milbourn* for a requirement that the trial judge tailor every defendant's sentence in relationship to the defendant's age. Persons who are sixty years old are just as capable of committing grievous crimes as persons who are twenty years

---

[31] MCL 791.234(4); MSA 28.2304(4) defines parole eligibility.

old. We find no principled reason to *require* that a judge treat similar offenses that are committed by similarly depraved persons differently solely on the basis of the age of the defendant at sentencing where the Legislature has authorized the judge to impose life or *any* term of years. A judge may, however, consider a defendant's age at sentencing in deciding whether the sentence about to be imposed is proper, just as the judge considers the recommended range under the guidelines and any other factors not expressly prohibited by law.[32]

Because there is some ambiguity in the Court of Appeals opinion regarding whether it found the sentence proportionate to the offender, we briefly address that issue. Our review of the record reveals that both defendants laughed at trial when one of the victims testified that she, unlike her stepbrother who wished his parents were dead, wanted them to live and suffer like she suffered. The record further reveals that the defendants rejected plea bargains that would have spared their children the horror of reliving multiple acts of sexual abuse before strangers and the public, and that the defendants expressed no remorse whatsoever for the obvious pain and suffering they inflicted on their children. Contributing to our review of Mr. Lemons as an offender, the record also reveals that he committed multiple criminal acts that went uncharged. In the presentence investigation report, "[t]he only positive factor the Court represen-

---

[32] While we recognize, as observed by the dissent, that parole eligibility is authorized for Mr. Lemons' offenses under MCL 791.233b(w); MSA 28.2303(3)(w), we find nothing in that statute to indicate that parole eligibility is required where the sentence imposed is valid in that it is indeterminate, within the legislatively authorized range, and proportionate.

tative could find in Mr. Lemons background [was] that he has no prior adult felony convictions, remains married . . . , and is in good physical health, denying . . . [use of] illegal substances." All other factors operated in favor of lengthy incarceration and against the possibility of rehabilitation. Finally, the record reveals that the trial judge determined both defendants to be liars. "Under *Milbourn*, the 'key test' of proportionality is not whether the sentence departs from or adheres to the recommended range, but whether it reflects the seriousness of the matter." *People v Houston*, 448 Mich 312, 320; 532 NW2d 508 (1995). The sentences imposed were proportionate to the perversity of the acts and of the offender despite his age at sentencing.

We conclude that the defendant's sentences were not excessive under *Moore* in light of his age at sentencing where the indeterminate sentences were authorized by the Legislature and were proportionate to the offense and the offender under *Milbourn*. We reverse the decision of the Court of Appeals with regard to Mr. Lemons' sentences, and we reinstate the sentences imposed by the trial court.

### IV. CONCLUSION

In *People v Mary Cadry Lemons*, we reverse the Court of Appeals decision with regard to the trial court's refusal to instruct the jury on duress and CSC II, and we reinstate her convictions. In *People v Llewellyn Lemons*, we reverse the determination of the Court of Appeals that the sentences of 60 to 90 years were excessive in light of the defendant's age at sentencing, and we reinstate those sentences.

MALLETT, C.J., and RILEY and WEAVER, JJ., concurred with BOYLE, J.

CAVANAGH, J. *(concurring in part and dissenting in part)*. I concur with the majority's disposition of defendant Mary Lemons' appeals, and therefore I join in parts I and II of the majority opinion. However, in part III, which addresses defendant Llewellyn Lemons' appeal of his sentencing to two terms of sixty to ninety years,[1] the majority ignores the fundamental and most important operative distinction—that is, between parolable and nonparolable offenses—and blithely condones the sentencing court's abuse of discretion in fashioning these challenged sentences.

In my opinion, given that Llewellyn Lemons received a valid life sentence on a separate but related count, the only conceivable rationale for sentencing him to two terms of sixty to ninety years was to effectively prevent the parole board from assuming jurisdiction over him pursuant to MCL 791.234(4); MSA 28.2304(4).[2] A sentence fashioned for the sole purpose of depriving the parole board of its legislatively provided jurisdiction constitutes an abuse of a sentencing court's discretion. It is well established that a sentencing court must exercise its discretion within the parameters established by the Legislature. See *In re Campbell*, 138 Mich 597; 101 NW 826 (1904); *People v Moore*, 432 Mich 311; 439 NW2d 684 (1989); *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

---

[1] Defendant Llewellyn Lemons also was sentenced to one life term, but that sentence was not vacated by the Court of Appeals and is not at issue in this appeal. The sentencing guidelines recommended a minimum term of fifteen to thirty years, or life in prison.

[2] Defendant, forty-five years old at the time of sentencing, would have to live to age 105 before he could receive parole consideration.

Pursuant to MCL 791.233b(w); MSA 28.2303(3)(w), criminal sexual conduct in the first degree is a parolable offense. This explicit legislative pronouncement, under which a prisoner is subject to the jurisdiction of the parole board after serving the minimum term less available disciplinary credits, compels us to invalidate any sentence fashioned solely for the purpose of precluding parole board jurisdiction over a prisoner. And it bears repeating that "being subject to the jurisdiction of the parole board and actually being paroled are two distinctly different prospects. Few prisoners serving parolable life sentences are ever paroled." *People v Merriweather*, 447 Mich 799, 813-814; 527 NW2d 460 (1994) (CAVANAGH, C.J., dissenting). "Sentencing a defendant with the sole intent of effectively preventing the jurisdiction of the parole board is contrary to the legislative scheme and, accordingly, is an abuse of a sentencing court's discretion." *Id.* at 816.

I would affirm the decision of the Court of Appeals with respect to Llewellyn Lemons' two sentences of sixty to ninety years, and would remand for imposition of a life sentence on these two counts in accordance with *Moore, supra.* On this basis, I dissent.

BRICKLEY, J., concurred with CAVANAGH, J.

KELLY, J., took no part in the decision of this case.