# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DIARRA BRYANT,

       Defendant-Appellant.

UNPUBLISHED
September 25, 2018

No. 339925
Wayne Circuit Court
LC No. 96-001846-01-FC

Before: SWARTZLE, P.J., and JANSEN and O'BRIEN, JJ.

PER CURIAM.

When defendant was 17 years old, he led a group of codefendants on an overnight crime spree. The group held two brothers hostage, shot and killed one of them, and attempted to extort money from the surviving brother. Defendant was convicted of first-degree felony murder, MCL 750.316(1)(b), and given a mandatory sentence of life without parole. Following the federal Supreme Court's decision that this type of mandatory sentence violates the Eighth Amendment, defendant was resentenced under MCL 769.25a to a prison term of 35 to 60 years. Defendant appeals as of right from this resentencing. We affirm.

## I. BACKGROUND

This case results from the murder of Robert Allen and the armed robbery and kidnapping of McKinley Allen in 1996. During the incident, defendant, and his codefendants who were tried separately, Jon Turnbore and Levar Perkins, robbed McKinley and held him captive after defendant shot Robert in the head. As explained previously by this Court:

> In January of 1996, [McKinley] and his brother, [Robert], returned to their apartment in Detroit, after a family gathering. As they were entering their apartment, an upstairs tenant yelled to them through the window that [defendant] was attempting to contact [McKinley]. [McKinley] then went to the tenant's apartment to phone [defendant]. [Defendant] apparently needed money and offered to sell [McKinley] $200 worth of drugs for which he would be paid $250 the following day, after [McKinley] received his retirement check. [McKinley] declined the offer and then returned to his apartment to watch television with his brother. Out of this seemingly simple event, there arose a melange of violence

-1-

and coercion, including a brutal and cold-blooded murder, armed robbery, kidnapping and assault with intent to rob while armed.

Approximately one-half hour after the fateful phone call, [defendant] and defendant Levar Perkins arrived at the Allens' apartment. [McKinley] and [defendant] went into one of the bedrooms, apparently to discuss the potential drug transaction. Defendant Perkins stood in the living room in front of the door, and [Robert] continued to watch television. [McKinley] apparently again declined [defendant's] offer, and both he and [defendant] left the bedroom. [McKinley] sat down to watch television, while [defendant] walked toward the door. [McKinley] heard the sound of a gun cocking. He then saw [defendant] run behind [Robert] and shoot him in the back of the head, killing him.

As [McKinley] attempted to get out of his chair, [defendant] ran up to him, pointed the gun in his face and then handed the gun to defendant Perkins. [McKinley] began to cry and shake, whereupon defendant Perkins told him to "stop crying because if we wanted you dead, you'd be dead." [McKinley] asked [defendant] why he had shot his brother, and [defendant] responded, "I didn't like the fat m**********r no way." [Defendant] asked [McKinley] if [Robert] had any money. [McKinley] denied that he did and [defendant] then searched through [Robert's] pockets, finding [McKinley's] car keys.

Defendant Turnbore then arrived at the apartment and was admitted. [Defendant] left to retrieve [McKinley's] license and registration from [McKinley's] automobile, leaving the gun with defendant Perkins with instructions to hold it on [McKinley]. [Defendant] returned with some documents, retrieved the title to [McKinley's] automobile from [McKinley's] briefcase, told [McKinley] that he wanted his automobile, put the gun in [McKinley's] face and demanded that [McKinley] sign the title over to him. Not surprisingly, given the fact that [defendant] had just killed his brother, [McKinley] complied.

During this time, [defendant], defendant Perkins and defendant Turnbore milled around the apartment, with [defendant] bragging to defendant Perkins and defendant Turnbore about the killing. According to [McKinley], [defendant], defendant Perkins and defendant Turnbore acted as if they were at a party: [defendant] smoked a cigarette and, knowing that [Robert] disliked cigarette smoke while he was alive, blew smoke into [Robert's] face and asked him "how you like the smoke, Robert?"

In yet another variation on the overall theme of violence and coercion, [defendant], apparently knowing that [McKinley] had a bank card that allowed him twenty-four hour access to his bank account, demanded the bank card from him. [McKinley] told [defendant] that his girlfriend Denise Thompson had the bank card. [Defendant] then forced [McKinley] to get into his automobile and, with defendant Perkins carrying the gun, drove to Thompson's house, while defendant Turnbore remained in the apartment. Thompson, angry that

[McKinley] had brought strangers to her house, told him that she did not have his bank card. [Defendant], [McKinley] and defendant Perkins then got back into the car and returned to the apartment.

In a final spasm of intimidation and violence, [defendant], knowing that funds were directly deposited into [McKinley's] bank accounts on the first and third of every month, decided that he, defendant Perkins and defendant Turnbore would hold [McKinley] in the apartment overnight and then force him to go to the bank in the morning to make a withdrawal from these bank accounts. During this time, [defendant] would occasionally leave the apartment and the gun would pass between defendant Perkins and defendant Turnbore.

At approximately 9:00 a.m. the next day, [defendant] directed [McKinley] and defendant Turnbore to get into the car and go with him to the bank, while defendant Perkins remained in the apartment. [Defendant] drove, while defendant Turnbore, holding the gun, sat in the back seat behind [McKinley]. When they arrived at the bank, [defendant], [McKinley] and defendant Turnbore went inside. [Defendant] and defendant Turnbore stayed in the back of the bank lobby while [McKinley] got into line. With [defendant] and defendant Turnbore out of earshot, [McKinley] told the man standing in line in front of him, one Troque Halliburgh, that the two men in the bank had shot his brother and held him in his apartment all night. [McKinley] asked Halliburgh to go to the front of the line, pretend to transact business and explain the situation to the teller. After asking [McKinley] if he were "for real," Halliburgh complied, the first act of simple decency in this entire tragic and sordid affair.

Shortly thereafter, police officers arrived at the bank. Upon seeing them, defendant Turnbore fled. [Defendant] also attempted to flee, but the police officers apprehended him. [McKinley] told the police officers that defendant Turnbore was also involved and had a gun; the police apprehended defendant Turnbore near the bank. While defendant Turnbore was not in possession of a gun when apprehended, a private citizen found a gun, later determined to be the murder weapon, on the street near the bank and turned it over to police.

While still at the bank, [McKinley] told the police officers that two other individuals were in his apartment, that his brother had been shot and that his brother's body was also still in the apartment. The police subsequently arrested defendant Perkins and another individual, one Tujuan Wheeler, at the apartment. Needless to say, the police also found [Robert's] body. [*People v Turnbore*, unpublished per curiam opinion of the Court of Appeals, issued October 27, 1998 (Docket Nos. 200911 and 201881), pp 1-3 (cleaned up).]

For his part in these crimes, defendant was convicted in 1997 of first-degree felony murder, MCL 750.316(1)(b), assault with intent to rob while armed, MCL 750.89, armed robbery, MCL 750.529, kidnapping, MCL 750.349, and possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b. The trial court sentenced defendant to

prison terms of life without parole for felony murder and kidnapping, 20 to 60 years for assault with intent to rob while armed and armed robbery, and two years for felony firearm.

In 1999, this Court affirmed defendant's convictions and sentences in part, and it vacated defendant's kidnapping, assault-with-intent-to-rob-while-armed, and armed-robbery convictions. *People v Bryant*, unpublished per curiam opinion of the Court of Appeals, issued October 29, 1999 (Docket No. 203312). Following *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *Montgomery v Louisiana*, ___ US ___; 136 S Ct 718; 193 L Ed 2d 599 (2016), defendant was resentenced to 35 to 60 years of imprisonment for the felony-murder conviction and two years of imprisonment for the felony-firearm conviction.

This appeal followed.

## II. ANALYSIS

### A.    Standards of Review

Defendant argues that his minimum sentence of 35 years of imprisonment violates the principle of proportionality for a number reasons, including the trial court's failure to consider the characteristics of youth as a mitigating factor. "This Court reviews sentencing decisions for an abuse of discretion." *People v Skinner*, ___ Mich ___, ___; ___ NW2d ___ (2018) (Docket Nos. 152448, 153081, and 153345); slip op at 35. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

A trial court's "factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (cleaned up). "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). "We review do novo constitutional issues and matters of statutory interpretation." *People v Harris*, 499 Mich 332, 342; 885 NW2d 832 (2016).

### B.    The Characteristics of Youth

As noted above, defendant was sentenced in 1999 as a juvenile to life without parol for his felony-murder conviction. In 2012, the Supreme Court of the United States decided *Miller*, which "held that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments." *Skinner*, ___ Mich at___; slip op at 9 (cleaned up). The *Miller* Court's conclusion was based on several factors unique to juvenile offenders. *Id*. Among those factors are:

> defendant's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; the

family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional; the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; whether he might have been charged with and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and the possibility of rehabilitation. [*Id*. at ___; slip op at 9-10 (cleaned up).]

At the time of its release, it was unclear whether *Miller* applied retroactively. *People v Wines*, ___ Mich App ___; ___ NW2d ___ (2018) (Docket No. 336550); slip op at 1. Thus, in 2014, the Michigan Legislature passed MCL 769.25a, which adopted sentencing provisions that would come into effect in the event that *Miller* was held to apply retroactively. *Id*. MCL 769.25a "provides that prosecutors may seek a re-imposition of life without parole imprisonment" for a defendant sentenced pre-*Miller* "if they file a motion to do so within a defined period of time." *Wines*, ___ Mich App at ___; slip op at 1. If the prosecutor does not file such a motion, however, then the trial court is required to "sentence the individual to a term of imprisonment for which the maximum term shall be 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25a(4)(c).

In 2016, the federal Supreme Court determined that *Miller* had retroactive effect and MCL 769.25a became effective. *Montgomery*, ___ US ___; 136 S Ct 718; *Wines*, ___ Mich App at ___; slip op at 1. Then, in 2018, this Court issued *Wines* and addressed the trial court's fact-finding duties on resentencing following *Miller* and *Montgomery*. In *Wines*, this Court concluded that a resentencing court is not required "to specifically make findings as to the *Miller* factors except in the context of a decision whether to impose life without parole." *Id*. at ___; slip op at 4. This Court further noted that "when sentencing a minor convicted of first degree murder, when the sentence of life-without-parole is not at issue, the court should be guided by a balancing of the *Snow* objectives and in that context is required to take into account the attributes of youth such as those described in *Miller*." *Id*. According to *Wines*, the *Snow* objectives were "articulated by the Michigan Supreme Court in *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972)." *Id*. Under *Snow*, in imposing any criminal sentence—whether of a juvenile or an adult—the sentencing court "should balance the following objectives: (1) reformation of the offender, (2) protection of society, (3) punishment of the offender, and (4) deterrence of others from committing like offenses." *Id*. (cleaned up).

Here, the prosecutor notified the trial court that it did not wish to seek a renewed sentence of life without parole and that defendant should be resentenced within the limits of MCL 769.25a. Thus, when resentencing defendant, the trial court was not required to make specific factual findings regarding each of the *Miller* factors. On appeal, we review the trial court's factual findings for clear error to determine whether its decision was guided by a balancing of the *Snow* objectives and a consideration of the unique attributes of youth. *Id*.

Regarding the reformation of the offender, at the resentencing hearing the trial court received evidence that defendant had been involved in many educational programs while incarcerated and that he had been "trying to have positive social interactions." Additionally,

defendant had been involved in community service events and "had glowing work reports." Defendant's attorney noted that, in the hope that defendant would eventually receive parole, the State Appellate Defender's Office had been working with defendant to develop a "re-entry program" which included educational and work components. For his part, at the sentencing hearing, defendant acknowledged his role in the underlying crime and apologized to the victim's family for his actions. In making its decision, the trial court noted that, since defendant's initial incarceration, he has become a "positive role model to others who are in prison" and commended defendant for his actions in that regard.

Regarding the protection of society and the punishment of the offender, the record shows that, in committing the underlying offense, defendant led a group of codefendants on a night-long crime spree. Defendant shot Robert in cold blood, held McKinley hostage overnight, and attempted to extort money from McKinley. At resentencing, the trial court was reminded of these facts and was read a letter from Robert's family detailing the trauma they suffered following the crime. The trial court commended defendant's efforts at reform but stated that "it doesn't change what happened that night back in 1996. And it doesn't, and it will never bring Mr. Allen back to his family. And the family has suffered greatly because of your actions." Thus, the record confirms that the trial court considered these two *Snow* factors.

Concerning the deterrence of others, one of defendant's co-defendants was sentenced to 34 years in prison. The trial court compared defendant's conduct to that of his co-defendant, noting, "You were the one who pulled the trigger and ended Mr. Robert's life that night and coerced your friends to engage in that activity." The trial court opined that sentencing defendant to a 25-year prison term would not be "just" in light of his co-defendant's sentence, thereby implicating the need to deter future offenders from coercing others into criminal activity.

Thus, the record shows that the trial court's resentencing was guided by the *Snow* factors. Equally clear from the record is that the trial court considered those factors in light of the attributes of youth. At the outset of its decision, the trial court acknowledged that defendant's original sentence was overturned by *Miller* and *Montgomery* and noted that the law now "take[s] into account the decisionmaking process that young minds go through, and that they are not fully developed, and they don't have the capacity to make decisions as well as adults do." While the trial court did not address the *Miller* factors specifically, it was not required to do so. From the trial court's comments at resentencing, it is clear that the trial court understood that the purpose of the resentencing was to reevaluate defendant's sentence in light of his youth, and the trial court considered those attributes when determining defendant's new sentence. Defendant's arguments to the contrary are without merit.

C.     Principle of Proportionality

Next, defendant argues, in both his brief on appeal and his separate Standard 4 Brief, that his minimum sentence of 35 years of imprisonment violates the principle of proportionality because his sentence was not individualized. "Michigan's Legislature has determined that the proper approach to sentencing is to favor individualized sentencing for every defendant." *People v Sabin (On Second Remand)*, 242 Mich App 656, 661; 620 NW2d 19 (2000). "The Legislature has subscribed to this principle of proportionality in establishing mandatory sentences as well as minimum and maximum sentences for certain offenses." *People v Babcock*, 469 Mich 247, 263;

666 NW2d 231 (2003). "Legislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011).

Defendant's sentence for his felony murder conviction fell within the legislatively mandated range under MCL 769.25a(4)(c) and is presumptively proportional. Defendant attempts to rebut this presumption by arguing that the trial court failed to provide defendant with an individualized sentence because it did not consider mitigating factors or provide a rationale for his sentence. As shown above, the record demonstrates otherwise. The trial court commended defendant's efforts at reform while in prison, but concluded that defendant's efforts at reform could not return Robert to his family. The trial court concluded that defendant was the principal offender of the crime, pulling the trigger that ended Robert's life and coercing his codefendants into an overnight crime spree. Ultimately, the trial court sentenced defendant to a minimum term of 35 years—ten years above the statutory minimum—and the trial court adequately expressed its reasoning for doing so. Yet, it is not lost on this Court that MCL 765.25a authorized the trial court to impose a 40-year minimum sentence. Given the heinous nature of defendant's crimes, it appears clear that defendant's attempts at reformation did mitigate his sentence to the tune of five years off his minimum.

Relatedly, defendant asserts that his sentence violates the principle of proportionality because the trial court "based" defendant's sentence on his co-defendant's sentence. As noted above, the trial court did compare defendant's potential sentence to the sentence that his co-defendant received for his participation in the underlying crimes, but the trial court was justified in doing so. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *Babcock*, 469 Mich at 263. Given that defendant was the principal offender— "the one who pulled the trigger and ended Mr. Robert's life"— it would rationally follow that he should receive a harsher sentence than his co-defendant. In making this comparison, the trial court did not "base" defendant's sentence on that of his co-defendant, but rather engaged in the type of reasoned comparison that characterizes our system of individualized sentencing.

*Defendant's Sentence Does Not Violate the Eighth Amendment*. Next, defendant asserts that his minimum sentence of 35 years of imprisonment violates the Eighth Amendment of the United States Constitution because it is a "de facto" life sentence. Defendant's argument rests upon the Michigan Supreme Court's decision in *People v Moore*, 432 Mich 311, 329; 439 NW2d 684 (1989), which held that a sentence for a term of years "must be an indeterminate sentence less than life. It must be something that is reasonably possible for a defendant actually to serve." Yet, *Moore* was implicitly overruled in *People v Lemons*, 454 Mich 234, 258-259; 562 NW2d 447 (1997), in which the Michigan Supreme Court concluded that, although a trial court may consider a person's elderly age at sentencing (and thus the person's ability to serve a term of years sentence), there is no statutory requirement that the trial court do so. Thus, following *Lemons*, the punishment is tailored to the crime, and a person's likely ability to serve a sentence is irrelevant.

Even assuming for the sake of argument that *Miller* requires courts, in the context of a juvenile offender, to consider whether a term of years is a de facto life sentence without parole, we find that defendant's sentence is not a de facto life sentence. Defendant argues that his 35-year minimum sentence is a de facto life sentence because the life expectancy of persons in

prison is generally lower than the life expectancy of persons outside of confinement. Yet, defendant will be approximately 55 years old when his 35-year minimum is served. Despite evidence that prisoners are expected to live shorter lives than the general population, defendant has not shown that there is no reasonable possibility of him living to 55 years old. Defendant's sentence is not a de facto life sentence.

*Sentencing Guidelines.* Finally, defendant argues that the absence of sentencing guidelines applicable to MCL 769.25a violates his right to due process and "Michigan's individualized sentencing guidelines." While the Legislature has chosen to provide for sentencing guidelines for many offenses, it retains the constitutional ability to impose mandatory sentences or other restrictions on a judge's exercise of discretion. *People v Hegwood*, 465 Mich 432, 440; 636 NW2d 127 (2001); *Brown*, 294 Mich App at 392. MCL 769.25a provides for a mandatory minimum sentence between 25 and 40 years of imprisonment and defendant has not shown that the trial court's decision to impose a 35-year minimum sentence was not individualized to the facts of this case.

Affirmed.

/s/ Brock A. Swartzle
/s/ Colleen A. O'Brien