*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEVEN JAMES HOCH,

Defendant-Appellant.

UNPUBLISHED
November 30, 2023

No. 362132
St. Clair Circuit Court
LC No. 20-000869-FH
　　　　　21-002387-FH[1]

Before: RIORDAN, P.J., and CAVANAGH and GARRETT, JJ.

PER CURIAM.

A jury convicted defendant, Steven James Hoch, of operating a motor vehicle while intoxicated (OWI), third offense, MCL 257.625(1) and (9), operating a motor vehicle while license suspended or revoked, MCL 257.904(1), and operating a motor vehicle without security, MCL 500.3102. Hoch argues that the traffic stop leading to his arrest was unlawful, so the trial court erred by denying his motion to suppress. He also claims that the trial court should have instructed the jury on the affirmative defenses of duress and necessity. Because the police had reasonable suspicion derived from a reliable 911 call to stop Hoch's vehicle, the motion to suppress was properly denied. And because Hoch did not present evidence to support every element of duress and necessity, the trial court did not err by refusing to instruct the jury on those defenses. We affirm.

## I. BACKGROUND

During the overnight hours of March 1, 2020, a bizarre series of events occurred in St. Clair, Michigan that led to Hoch's arrest and convictions on several driving-related offenses. Around 2:15 a.m. that morning, Dawn Decker and her daughter, Bridgette Dano, were watching

---

[1] Hoch's charges were originally filed under lower court number 20-000869-FH. The charges were later dismissed, and the prosecution refiled the charges under lower court number 21-002387-FH.

television in Decker's home on Clinton Avenue. They suddenly heard a "loud bang" from outside in front of the house. When they looked outside, they saw Hoch standing outside of a dark-colored vehicle. Dano believed the vehicle had hit and gone up the curb, as "the front end of [Hoch's] vehicle was in [the] front yard and then crossing over the driveway." Decker went outside on the porch and spoke to Hoch, who said he was fixing his car door. She also observed another man walking up Clinton Avenue street toward Carney Drive. Decker told Hoch that the police had been called and not to leave the scene.

Meanwhile, Dano had called 911 and provided real-time information to the operator about her and Decker's observations. Dano said that "somebody crash[ed] in [her] driveway." She noted that Hoch "ripped" the passenger-side door of the car off, while another man, later identified as Michael Basman, took off on foot up Clinton Avenue toward Carney Drive. About halfway into the call, Dano told the 911 operator that Hoch got the door back on, jumped into the vehicle, and drove up Clinton Avenue in the same direction as the man who walked away. "He's driving in the middle of the road, you can't really miss him," she continued. Dano then described Hoch turning the vehicle around twice and later "doing circles" in the middle of the road. Based on Dano's observations, police officers were dispatched for a "possible drunk driver."

Three minutes into the 911 call, Officer Ryan Young and Sergeant Jacob Patchett of the St. Clair Police Department arrived at the scene. As he approached, Officer Young observed Hoch's vehicle make a U-turn on Clinton Avenue and then activated his emergency lights to pull the vehicle over. Hoch exhibited several signs of intoxication, including bloodshot eyes, slurred speech, and a strong alcohol odor on his breath. He refused to take a field sobriety test or a breath test, so officers obtained a warrant for a blood draw. The toxicology report found that Hoch had a blood-alcohol content of 0.218 grams of alcohol per 100 millimeters of blood, nearly three times higher than the legal limit. See MCL 257.625(1)(b) (stating that a person shall not operate a vehicle when the person has an "alcohol content of 0.08 grams or more per 100 milliliters of blood"). Additionally, Hoch did not have a valid driver's license, and the vehicle did not have insurance on the day of the incident. Hoch was arrested and charged with OWI-third offense, operating a motor vehicle with a suspended license, and operating a motor vehicle without security.

In September 2020, Hoch moved to suppress all evidence obtained from the stop of the vehicle. He argued that the police lacked reasonable suspicion to conduct the traffic stop because there was no evidence that the police witnessed any bad driving or criminal activity. The trial court held an evidentiary hearing the next month, at which Decker, Dano, Officer Young, and Sergeant Patchett testified. In a subsequent opinion and order, the trial court concluded that police officers had reasonable suspicion to stop Hoch's vehicle. The court found that the tip received from the 911 call was "extremely reliable" and that the message relayed by dispatch to the officers identified "erratic" driving that was "suggestive of possible operating while intoxicated." The court also noted several other factors that supported the reasonableness of the investigatory stop:

> Given the short amount of time between the 911 call and the officers' arrival at the scene, the lack of other cars in the area, and the fact that the car matched the description of the vehicle given by dispatch, the officers' [sic] had reasonable suspicion to believe that [Hoch's] car was the car identified by Decker and Dano as the one that had caused the loud noise in front of their house and had been driving in circles in the middle of the street.

For these reasons, the trial court denied Hoch's motion to suppress.

Hoch filed a renewed motion to suppress and motion to quash in March 2021, claiming that he had only recently received patrol car dashcam footage and an in-car audio recording. Hoch argued that the video and audio records did not support the evidence presented at the preliminary examination and evidentiary hearing. Had these records been introduced earlier, Hoch asserted, the charges against him would not have been bound over to circuit court and the motion to suppress would have been granted. The prosecution opposed Hoch's requests and disputed his factual claims about disclosure of the dashcam video. The trial court denied both motions. On the motion to suppress, the court considered Hoch's motion to be an untimely motion for reconsideration. Even so, the court noted that the dashcam video did not change its view that the stop of Hoch's vehicle was lawful. The court emphasized that at the evidentiary hearing, it considered the testimony of the eyewitnesses and the information communicated to the officers by the 911 dispatcher. Whether or not the officers' testimony aligned exactly with the dashcam footage was an issue of credibility that did not invalidate the traffic stop.

In October 2021, charges against Hoch were dismissed without prejudice because Officer Young was unavailable to attend trial and the case could not be adjourned further. The prosecution immediately refiled the three charges against Hoch, the charges were bound over to circuit court, and the case proceeded to trial. Hoch again moved to suppress the evidence seized from the traffic stop and quash the complaint; he also requested another evidentiary hearing. Citing the recently released decision in *People v Pagano*, 507 Mich 26; 967 NW2d 590 (2021), Hoch argued that police officers lacked reasonable suspicion to stop Hoch's vehicle. Hoch also claimed that the dashcam video showed that Hoch's vehicle never made a U-turn in front of Officer Young. The prosecution opposed the motions and noted that the dashcam footage did not depict everything that Officer Young observed as he approached Hoch's vehicle. At a hearing, the court explained that, even accepting that the dashcam footage did not show Hoch's vehicle making a U-turn, the information relayed by Dano and Decker and dispatched to the police officers was enough to find reasonable suspicion of drunk driving. Accordingly, for a third time, the trial court denied the motion to suppress; the court also denied the motion to quash and declined to hold another evidentiary hearing.[2]

At trial, Dano, Decker, Officer Young, and Sergeant Patchett again testified to their actions and observations during the early morning hours of March 1, 2020. Basman testified in Hoch's defense, explaining that he was Hoch's designated driver and that he drove Hoch to a bar on the night of the incident. After leaving the bar, Basman began to drive Hoch home. Hoch began telling Basman where to go, putting his hand in Basman's face, and making "annoying" comments. "[B]eyond annoyed" with Hoch, Basman applied the emergency brake, got out of the vehicle, walked over to the passenger side door, and tried to open the door to remove Hoch from the vehicle. Basman and Hoch were each pulling on the door when the inside panel "ripped off." Basman then

---

[2] Hoch sought an interlocutory appeal from this decision. This Court denied the application for leave to appeal "for failure to persuade the Court of the need for immediate appellate review." *People v Hoch*, unpublished order of the Court of Appeals, entered April 7, 2022 (Docket No. 360524). Our Supreme Court also denied leave to appeal. *People v Hoch*, 509 Mich 974 (2022).

heard Decker shouting from the house in front of the vehicle. Basman decided to leave Hoch and the vehicle and began walking away from the scene because he "didn't want to punch [Hoch]" in the mouth.

Hoch testified in his own defense and confirmed that he had several drinks at the bar, and that, afterward, Basman began to drive him home. After the altercation that Basman described, Decker came out of her house and started shouting, which "startled [Basman] enough to walk away." Hoch then noticed that the vehicle was parked in front of Decker's house and that the "back portion of the trunk [was] blocking her driveway." He claimed that he was not too drunk "to move the vehicle to a safe parking space." Unbeknownst to Hoch at the time, the vehicle was also parked in a fire lane outside of Decker's house and there were "no parking" signs displayed on the street. Hoch testified that he drove the vehicle down the street and was looking for a place to park when the police arrived.

At the close of trial, Hoch asked the trial court to instruct the jury on the affirmative defenses of duress and necessity. Hoch argued that Basman's conduct of trying to remove him from the vehicle constituted a reasonable threat of death or serious bodily harm, so he was compelled to drive the vehicle while intoxicated to get away from Basman. Hoch also claimed that he was afraid of Basman returning to the scene and had a reasonable fear of traffic in the area. The trial court concluded that the alleged threat of serious bodily injury from Basman was no longer present or imminent when Hoch drove the vehicle away from Decker's house, so a duress instruction was not justified. And the court found no legal basis for Hoch's proposed instruction on necessity. The trial court therefore declined to instruct the jury on either defense.

The jury convicted Hoch as previously noted. The trial court sentenced Hoch as a fourth-offense habitual offender, MCL 769.12, to 10 months in jail and two years' probation for the OWI conviction, and six days in jail, time served, for the remaining two convictions. Hoch now appeals as of right.

## II. MOTION TO SUPPRESS

Hoch argues that the police lacked reasonable suspicion to justify the stop of his vehicle, so the evidence seized as a result of the stop should have been suppressed.

"We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). Under the clear-error standard, we defer to a trial court's factual findings unless we are left with a "definite and firm conviction that the trial court made a mistake." *People v Wiley*, 324 Mich App 130, 165; 919 NW2d 802 (2018) (cleaned up). But on de novo review, we evaluate the legal issues independently, "with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

Both the Michigan and United States Constitutions guarantee the right of persons to be secure against unreasonable searches and seizures. Const 1963, art 1, § 11; US Const, Am IV. "Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996). One such exception is an investigative stop, also known as a *Terry* stop.

*Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Under *Terry*, "if a police officer has a reasonable, articulable suspicion to believe a person has committed or is committing a crime given the totality of the circumstances, the officer may briefly stop that person for further investigation." *People v Barbarich*, 291 Mich App 468, 473; 807 NW2d 56 (2011). Because a traffic stop constitutes a seizure of a vehicle's occupants, a lawful traffic stop requires a police officer to have "an articulable and reasonable suspicion that a vehicle or one of its occupants is subject to seizure for a violation of law." *People v Simmons*, 316 Mich App 322, 326; 894 NW2d 86 (2016) (cleaned up). Reasonable suspicion is a lesser showing than probable cause, but it requires more than a hunch that a crime is afoot. *Pagano*, 507 Mich at 32. "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the brief detention. *Terry*, 392 US at 21. "Whether an officer has reasonable and articulable suspicion to briefly detain an individual is a fact-specific inquiry that is determined on a case-by-case basis." *Pagano*, 507 Mich at 32. When reviewing the validity of a traffic stop, we consider the totality of the circumstances "in light of commonsense judgments and inferences about human behavior." *Barbarich*, 291 Mich App at 474. Of particular relevance here, "[a] police officer's reasonable suspicion may be based on information obtained from another." *People v Chambers*, 195 Mich App 118, 122; 489 NW2d 168 (1992).

Having reviewed the trial court's factual findings, the testimony from the evidentiary hearing, and the recording of the 911 call, we conclude that police officers had reasonable and articulable suspicion to conduct a traffic stop of Hoch's vehicle.[3] The series of events leading to Hoch's convictions began when Decker and Dano both heard a sudden loud noise outside their house and noticed a dark-colored vehicle in or alongside their driveway. Decker went outside to investigate, while Dano called 911 and relayed contemporaneous information from her and Decker's observations. Dano reported to the operator that a car had crashed into the driveway, the passenger-side door had been damaged, and Hoch was standing outside by this door while another man was walking away on Clinton Avenue. Dano further reported that Hoch fixed the door, got into the vehicle, and drove away. And she described the vehicle as "doing circles" in the middle of the street near the railroad tracks. Police officers were dispatched to the scene on reports of a possible drunk driver doing several circles in the middle of the road.[4] Officer Young and Sergeant Patchett promptly arrived in separate vehicles. Officer Young testified that he observed Hoch's vehicle make a U-turn in the middle of Clinton Avenue before activating his emergency lights and pulling the vehicle over. No other vehicles were present on the road. Officer Young also explained that, in his experience working as a police officer for several years, a majority of single-car accidents involved the use of alcohol.

---

[3] On appeal, Hoch does not argue that any evidentiary dispute created by the dashcam video provides a basis for suppression. His brief states, "Even if we ignore the conflict between the police testimony and the police video, the stop fails Fourth Amendment standards." We therefore focus on the testimony and exhibits admitted at the evidentiary hearing.

[4] Officer Young confirmed that a dispatch report, which contained several time-stamped statements from Dano's 911 call, was consistent with the information that had been dispatched to him as he drove to the scene.

Dano's 911 call, combined with police officers' observations corroborating her report, provided reasonable suspicion that Hoch was driving while intoxicated. To reiterate the specific and articulable facts: it was after 2:00 a.m.; Decker and Dano heard a "loud bang" consistent with a car accident; Hoch's vehicle was outside obstructing Decker's driveway; no other cars were on the road; the passenger-side door had broken; and Hoch drove off and began "doing circles" in the middle of the road. "[C]ommonsense judgments and inferences about human behavior" could lead a reasonable police officer to conclude that all these factors were consistent with a drunk driver. *Barbarich*, 291 Mich App at 474. See also *Hyde*, 285 Mich App at 437 ("[E]rratic driving . . . can give rise to a reasonable suspicion of intoxication justifying an investigatory stop.") Reasonable and articulable suspicion therefore existed to stop Hoch's vehicle on suspicion that he was driving while intoxicated.

Hoch claims that the Supreme Court's recent decision in *Pagano* supports his argument that police officers lacked reasonable suspicion to stop his vehicle. In *Pagano*, 507 Mich at 29-30, an anonymous 911 caller reported that an "obnoxious" woman was standing outside of her vehicle and was yelling at her children. The caller attributed the woman's behavior to intoxication. *Id*. The caller relayed a description of the vehicle, including the license plate number, and the direction in which it was traveling. *Id*. at 30. Within 30 minutes of the call, a police officer observed the defendant's vehicle, which matched the caller's description. *Id*. The officer followed the vehicle but did not see the defendant violate any traffic laws. *Id*. Yet based entirely on the anonymous 911 call, the officer stopped the defendant's vehicle and ultimately arrested her for driving while intoxicated. *Id*.

The *Pagano* Court noted that "[a]n anonymous tip, when sufficiently corroborated, can exhibit sufficient indicia of reliability to justify a *Terry* stop." *Id*. at 33. But that standard was not met in *Pagano*, as "the anonymous tip did not give rise to a reasonable and articulable suspicion that [the] defendant was engaged in a traffic violation, much less criminal activity." *Id*. at 33. While "certain driving behaviors are so strongly correlated with drunk driving that, when reported to the police by anonymous callers, the totality of the circumstances may give rise to a reasonable and articulable suspicion of criminal activity," this case fell far short of the justification needed for a traffic stop. *Id*. at 34, citing *Navarette v California*, 572 US 393, 402; 134 S Ct 1683; 188 L Ed 2d 680 (2014). The caller's assertion that the defendant was acting "obnoxious" and yelling at her children did not create a reasonable suspicion that the defendant was intoxicated. *Id*. at 34-35. "Certainly, commonsense judgments and inferences about human behavior lead one to conclude that many parents yell at their children, even without the aid of intoxicants." *Id*. at 34. Properly characterized, the 911 call provided "little more than a conclusory allegation of drunk driving," without any corroboration. *Id*. at 34-35. For these reasons, the traffic stop in *Pagano* violated the Fourth Amendment. *Id*. at 35.

The facts here are far afield from those in *Pagano*. First, Dano was not an anonymous tipster like the caller in *Pagano*; Dano gave the 911 operator her first name and address. Second, unlike in *Pagano*, the police officers in this case arrived at the scene and located Hoch's vehicle within minutes of the 911 call. Dano was even on the phone with the operator when she saw officers show up, which confirmed that she generally maintained sight of Hoch's vehicle during the entire call. Third and most importantly, Dano's call exhibited "sufficient indicia of reliability to justify a *Terry* stop." *Id*. at 33. The call contained specific and contemporaneous factual allegations about Hoch's actions, not generalized behavioral conclusions like those drawn by the

anonymous caller in *Pagano*. The contents of Dano's call were also corroborated in several respects by officers' observations—among other things, Hoch's vehicle generally matched the description of a dark sedan,[5] the vehicle was near the railroad tracks on Clinton Avenue when officers arrived, and Officer Young observed the vehicle make a U-turn. Considering the totality of the circumstances, police officers had reasonable suspicion to stop Hoch's vehicle, and therefore the trial court did not err when it denied Hoch's motion to suppress.

## III. JURY INSTRUCTIONS

Finally, Hoch claims that the trial court erred by denying his request to instruct the jury on the affirmative defenses of duress and necessity.

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

A criminal defendant is "entitled to have a properly instructed jury consider the evidence against him or her." *Dobek*, 274 Mich App at 82. Therefore, "[j]ury instructions must include all the elements of the charged offense, and must not exclude material issues, defenses, or theories if the evidence supports them." *People v Kosik*, 303 Mich App 146, 155; 841 NW2d 906 (2013). Additionally, "[a] defendant asserting an affirmative defense must produce *some evidence* on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *People v Guajardo*, 300 Mich App 26, 34-35; 832 NW2d 409 (2013) (emphasis added). An affirmative defense does not negate the elements of a crime but rather "seeks to justify, excuse, or mitigate it." *People v Aspy*, 292 Mich App 36, 49; 808 NW2d 569 (2011) (cleaned up).

## A. DURESS

Hoch contends that he presented sufficient evidence of threatening conduct by Basman to justify a jury instruction on duress.

"Duress is a common-law affirmative defense." *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997). To merit an instruction on the defense, a defendant must produce some evidence from which the jury could conclude that each element of duress is present:

> A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

---

[5] Although the vehicle was green, Basman testified at trial that it was a dark green; it also would have reasonably appeared darker to Dano and Decker at 2:15 a.m. than during daylight hours.

-7-

B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

D) The defendant committed the act to avoid the threatened harm. [*Id*. at 246-247.]

"The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (cleaned up).

At a minimum, Hoch's assertion of duress fails on the last element—whether Hoch committed the charged offenses to avoid the threatened harm. The undisputed evidence established that any alleged threat to Hoch's safety had passed by the time that he chose to drive the car while intoxicated. At trial, Basman testified that he stopped the vehicle and told Hoch that he was not going to drive him anymore because he was being annoying. Basman then walked around the vehicle to the passenger-side door. Basman began "yanking on the door" while Hoch tried to pull it closed. After Decker came out of her house, Basman stopped pulling on the door and walked away from Hoch and the vehicle. As Basman walked away, Hoch asked him, "[You are] leaving me like this?" As Basman began walking down the street, Decker and Hoch had a brief interaction. When Decker asked Hoch what happened, he told her that he was trying to fix his door because it had "fallen off." Decker told Hoch not to leave the scene because the police were on their way. But within a minute, Hoch moved to the driver's seat of the vehicle and drove down the street in the same direction that Basman had gone.

Any alleged threat that Basman posed to Hoch's safety had passed once Basman walked away from the scene and Hoch remained by the car outside Decker's house. Indeed, Hoch's claim that he was avoiding a purported threat is belied by his own actions. By driving the car in the direction that Basman had walked, he was putting himself closer to the allegedly threatening individual than if he had simply remained outside Decker's house.[6] Therefore, Hoch presented no evidence that he "committed the act [of driving while intoxicated] to avoid the threatened harm."

---

[6] In his appellate brief, Hoch stresses that he only drove "45 feet" from Decker's house before he was pulled over. Not only is this factually misleading but it is legally irrelevant. Officer Young testified only that he *personally observed* the vehicle travel 45 feet; there was no other evidence that Hoch drove the vehicle a total of 45 feet while intoxicated. Nor would it matter for purposes of legal sufficiency. *Operating* a motor vehicle, an element of each of Hoch's convictions, merely requires evidence that the vehicle has been put in motion; there is no physical distance requirement. See *People v Wood*, 450 Mich 399, 404-405; 538 NW2d 351 (1995) ("Once a person using a motor vehicle as a motor vehicle has put the vehicle in motion, or in a position posing a significant risk of causing a collision, such a person continues to operate it until the vehicle is returned to a position posing no such risk."). See also M Crim JI 15.2(2) (when proving a charge of operating while intoxicated, "*operate* means to drive or have actual physical control of the vehicle.").

*Lemons*, 454 Mich at 247. Without any evidence to support this element of duress, the trial court correctly concluded that the jury instruction was unwarranted.

Hoch contends that our Supreme Court's recent decision in *Gafken* supports his argument that the jury should have been instructed on the defense of duress. In that case, the defendant was driving a vehicle that the police were trying to pull over. *Gafken*, 510 Mich at 509. The defendant fled away at high speeds and collided with other vehicles, killing one person and seriously injuring several others. *Id*. The defendant moved to allow a duress defense, arguing that she should be allowed to testify that she did not pull over for the police because an occupant of the car "thrust a gun into her ribs and threatened to kill her if she stopped the car." *Id*. The trial court denied the defendant's motion, but on appeal, the Supreme Court held that she could raise the affirmative defense of duress. *Id*. at 510, 514. Unlike in *Gafken*, where the alleged threat was ongoing and imminent when the defendant was actively driving the vehicle, the alleged threat in this case had ended by the time Hoch moved to the driver's seat and drove the vehicle while intoxicated. *Gafken* is therefore distinguishable. The trial court did not err when it denied Hoch's request to instruct the jury on the defense of duress.

## B. NECESSITY

Hoch also argues that he presented sufficient evidence to warrant an instruction on the defense of necessity because it was "illegal and dangerous" for him to leave the car parked on the street by Decker's driveway.

There is little legal daylight that separates the defense of duress from the defense of necessity. The difference between them is that "the source of compulsion for duress is the threatened conduct of another human being, while the source of compulsion for necessity is the presence of natural physical forces." *People v Hubbard*, 115 Mich App 73, 77; 320 NW2d 294 (1982).[7] Hoch appears to suggest that the "natural physical force" that compelled him to drive the vehicle while intoxicated was that the vehicle had been parked in a fire lane, a "no parking area." But Hoch admitted at trial that he did not even know that the vehicle was parked in a "no parking area" when the incident took place. Hoch could not have been compelled to drive the vehicle out of concern for something he did not know. Hoch also suggests there was a risk that an oncoming car might have hit him had he not moved the vehicle. Unsupported speculation aside, there were no vehicles driving toward Hoch in the fire lane. Nor is there any evidence that being parking in

---

[7] "Although published decisions of this Court issued prior to November 1, 1990, are not strictly binding on this Court, all published decisions of this Court are precedential under the rule of stare decisis and generally should be followed." *Davis v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 362841); slip op at 9 n 10. There is a dearth of recent caselaw applying the necessity defense and distinguishing it from duress. At least one panel of this Court appeared to analyze duress and necessity interchangeably. See *People v Penrose*, unpublished per curiam opinion of the Court of Appeals, issued January 21, 2000 (Docket No. 214588), pp 1-3. While there is a model criminal jury instruction on duress, M Crim JI 7.6, no such instruction exists for necessity. In any event, we follow *Hubbard*'s guidance and assume that Michigan law recognizes the defense of necessity as distinct from the defense of duress.

the fire lane presented a risk of serious bodily injury or death to Hoch.  His claim of necessity does not withstand factual scrutiny.  Therefore, the trial court did not err by denying Hoch's request to instruct the jury on the defense of necessity.

We affirm.

/s/ Michael J. Riordan
/s/ Mark J. Cavanagh
/s/ Kristina Robinson Garrett