*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSHUA WEBB SMITH,

        Defendant-Appellant.

UNPUBLISHED
February 05, 2026
10:52 AM

No. 370661
Monroe Circuit Court
LC No. 22-247091-FH

Before: CAMERON, P.J., and M. J. KELLY and YOUNG, JJ.

PER CURIAM.

A married couple, defendant, Joshua Webb Smith, and Jessica Spooner,[1] lived together with their two daughters ES and BS in an apartment in Monroe County. On March 17, 2022, ES disclosed to her high school guidance counselor that Smith sexually assaulted her when she was 11 years old. Later, BS came forward alleging she was similarly assaulted.

Smith was charged with one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) and (2)(b) (sexual penetration of a child under 13 by someone 17 years of age or older), against ES (count 1), three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b) (sexual contact with a child under 13 years of age by someone 17 years of age or older), against ES (counts 2-4), and three counts of CSC-II against BS (counts 5-7). A jury convicted Smith of one count of CSC-I and three counts of CSC-II against ES, and acquitted him of the remaining counts against BS. Smith appeals as of right, arguing his defense counsel was ineffective, and that the trial court abused its discretion in denying defense counsel's request for a specific jury instruction. For the reasons set forth in this opinion, we affirm Smith's convictions.

---

[1] Jessica Spooner was formerly known as Jessica Smith, but the parties have since divorced. We refer to her as Spooner throughout this opinion.

-1-

# I. TRIAL SUMMARY

Smith's trial took place over the course of three days, beginning on the morning of January 22, 2024. During voir dire, the prosecutor asked potential jurors to raise their hands if they had been victims of sexual assault, or if a close friend of family member of theirs was a victim of sexual assault. Several jurors raised their hands and disclosed their relationship to the person they knew who was sexually assaulted. The prosecutor asked whether this would affect their ability to be fair and impartial, and four of them answered "no." One of them, Juror 3, disclosed her stepdaughter was sex-trafficked for five years. When asked if she could be fair and impartial, she responded: "I'll give it my all. It—it's difficult to let go of that. We just got her back." The prosecutor further inquired, "[D]o you understand the defendant has a right to a fair trial here" and Juror 3 responded "I do." The prosecutor asked "And can you separate the facts of this case and follow the instructions of the Judge independently of the situation involving your step-daughter?" Juror 3 responded "I believe so." Juror 3 went on to serve on the jury.

Another, Juror 122, explained his mother-in-law had been a victim of sexual abuse by a friend, and that his "wife is a (inaudible) of sexual assault (inaudible)." After Juror 122 stated he could be fair and impartial, defense counsel did not ask any further questions of him, and he went on to serve as foreperson. As jurors were dismissed and new jurors were selected from the venire, defense counsel used several peremptory challenges to shape the jury makeup. Juror 115 was selected from the venire and disclosed she was "sexually assaulted twice; once when I was 18 and when I was 22." The prosecutor asked whether there was anything about those experiences that would affect her ability to be fair and impartial, and she responded "no." Defense counsel did not probe Juror 115 about her relationship to the person who assaulted her, and she went on to serve on the jury. Defense counsel had four remaining preemptory challenges when the prosecutor and defense counsel both expressed satisfaction with the jury panel. The jury was impaneled.

Defense counsel began his opening statement with his theory of the case: "This is a case about parenting, outside influences, a failed marriage, and ultimately a failed investigation." The parties also stipulated to the admission of Exhibit 2, a two-page medical document from ES's visit to her pediatrician on February 8, 2019. Next, the jury heard testimony from Detective Davison, ES, Jessica Spooner, and BS on behalf of the prosecution. Finally, the jury heard Smith testify as the only witness for the defense. The testimony relevant to the issues raised by Smith on appeal is detailed below.

## A. DETECTIVE DAVISON'S TESTIMONY

Detective Davison conducted ES's forensic interview and testified at trial that he followed the forensic interview protocol, which is "a system that we use to interview children. And the goal of that interview is to obtain as much information from the child as possible with using a free narrative." After the forensic interview, Detective Davison determined a criminal investigation was warranted, and identified Smith as the suspect.

During cross examination, Detective Davison admitted that his forensic interview of ES was "one of the first interviews" he had done, and that he conducted "a handful prior to then." When asked by defense counsel to recite the four things each child is told at the beginning of a forensic interview, Detective Davison listed the first thing to do was to identify, through offering

examples, whether a child understood the difference between the truth and a lie. The second thing was to tell the child that if they did not understand something, to let the detective know; and the third thing was to tell the child not to guess any answers. He admitted he could not recall whether he asked ES and BS to identify a truth from a lie. Defense counsel identified that another important aspect of a forensic interview is to generate alternative hypotheses with questions to the child to ensure "the information you're getting is not just in itself being confirmed or believed, right?" Detective Davison answered "Yes."

Over the prosecutor's objection, the trial court allowed defense counsel to probe Detective Davison about whether he explored alternative hypotheses with ES, as required by the forensic interview protocol. These questions revealed that ES disclosed her father gave her massages for "growing pains," which the parties stipulated was a legitimate medical condition ES had that caused pain in her limbs. Detective Davison asked if anyone else gave ES massages, and she revealed Spooner also massaged her.

Defense counsel also probed Detective Davison about a dream ES had around the time she reported the sexual assault[2] to her high school guidance counselor. Detective Davison testified that he explored the alternative hypothesis that the sexual assaults ES was alleging could have been only a dream or could have been imagined. Defense counsel also asked whether ES made accusations to retaliate against Smith or was exaggerating an event to show off to or fit in with friends. Detective Davison answered that these could all be alternative hypotheses. He admitted he did not ask whether ES had medical issues other than growing pains, and that he did not ask whether ES was on any medication.

On redirect, the prosecutor asked Detective Davison why he did not ask ES whether she was on any medication. He responded that the forensic interview is supposed to be a free narrative, open-ended conversation and he was not supposed to ask "pointed questions." On recross, defense counsel asked whether a child would think to volunteer that they are on medication, and Detective Davison admitted that he would not expect a child to disclose this. Detective Davison's testimony concluded shortly thereafter.

## B. ES'S TESTIMONY

ES was a senior in high school at the time of trial. ES testified Spooner worked 60 hours a week while Smith did not work and stayed at home with her and BS. ES suffered from growing pains since she was eight years old. To treat her pain, Smith offered to give her massages. Smith began massaging ES when she was 11 years old. ES admitted that some of the massages Smith gave her when she was 11 alleviated her growing pains but several incidents occurred during the massages which made ES uncomfortable, including Smith touching her inner thigh and asking her to remove her underwear for the duration of the massage. ES described a massage during which Smith stuck his finger inside her vagina. ES said she never told Smith she had growing pains in or near her vagina, and the vaginal area hurt "a lot" the day after the incident.

---

[2] ES testified she had a "vivid dream" in early 2022 that Smith was sexually assaulting her, but she was sure that the sexual assault she experienced was not just a dream.

-3-

On another occasion, when ES's "hips genuinely hurt," Smith told her to remove her underwear and rubbed her body using cherry scented lotion while she was lying on his bed. Smith touched ES's buttocks, hips, lower and upper back. She was not wearing any underwear. Smith touched ES's buttocks despite her never reporting to him that she was having growing pains in her buttocks area.

On a third occasion, Smith was lying in bed and gestured for ES to come lay next to him. She got into bed and he pulled her to his chest. ES was laying on her back and her clothes remained on the entire time. ES described what happened next:

> He started rubbing my—my hips and my upper thigh. And I did feel uncomfortable about it, but I didn't do anything about it. He slipped-he ended up slipping his hand underneath my underwear, and he started touching my private areas. He did try to stick his finger inside me, but he didn't for whatever reason; he just started massaging my thighs, like, under my underwear, and I was—I was very upset, and I ended up pushing his hand away, and I left the bedroom.

ES clarified that Smith touched "the vulva" in "the pubic region" and tried to stick his finger inside her vagina, but stopped between her labia. After this incident, ES stopped discussing having growing pains with her father. She only disclosed growing pains to Spooner, who gave her Ibuprofen.

The prosecutor inquired further into ES's medical history. ES described an incident in February 2019 where she took a hot bath and a hot shower afterward. ES got out of the shower and was very dizzy, so she went into her parents' bedroom to find Smith, and passed out on the bedroom floor. She was taken to her pediatrician the following day, who thought she may have anemia and recommended eating salt and taking iron supplements. ES said her memory was not affected by this fainting spell in any way.

The first person ES told about the incidents with Smith was her friend over text[3] in 2021. The friend encouraged ES to tell someone, so ES disclosed "as little as [she] possibly could" to Spooner. ES was upset and crying "violently," and "couldn't really get anything out." . . . "I just told her that he was massaging me and I kind of felt uncomfortable with it, and that he did stick his finger in me at some point."[4] When Spooner confronted Smith about ES's allegations, he told her that "he was just checking [ES] for discharge."[5] ES said she never experienced or reported at

---

[3] ES described she was given a cell phone at "10 or 11" years old and that the cell phone was taken away at some point because she was viewing pornography.

[4] Spooner's testimony corroborated this. Spooner testified she noticed ES becoming depressed and producing artwork that was "really dark," so Spooner initiated a conversation with ES, wherein ES revealed the sexual assaults for the first time.

[5] Spooner testified: "I remember him saying something about he thought she had discharge—he was checking to see if she had discharge or something . . . ." Spooner told Smith "that's just not something that you do, even if you're a nurse, that's what we have doctors for." At that time,

age 11 that she was having any sort of vaginal discharge; she did not know what discharge was at that age.[6]

In early 2022, when ES was 15 years old, she began noticing BS was spending a significant amount of time alone with Smith. ES testified BS was "clingy" with Smith, which caused ES concern. Also around this time, ES had a "pretty vivid dream" about Smith sexually assaulting her, but testified there was no chance the incidents she described from when she was 11 were a dream. ES testified she took Singulair since she was 11 years old, was taking it around the time of her forensic interview, and still took it by the time of trial. ES was sure there was nothing about taking Singulair that affected her ability to recall events or memories, and never experienced any hallucinations, sleep disturbances, or had any other vivid dreams similar to the one about Smith sexually assaulting her.

On March 17, 2022, while at school, ES's friend disclosed to ES that she was a victim of sexual assault. ES then disclosed to her friend what Smith did to her. The friend took ES to the guidance counselor's office to report Smith, and the guidance counselor then informed CPS. ES called Spooner, who took her home from school where the two began packing their things to move out. They later picked BS up from school but did not tell BS why they were moving out. Spooner and the girls went to live with Spooner's sister.

## C. BS'S TESTIMONY

BS was 13 years old at the time of trial. BS also suffered from growing pains, and Smith offered massages that sometimes made her feel better. She testified that when she was 11 years old, Smith rubbed her vaginal area while the two were laying in his bed. This happened between 8 and 11 times, and BS was sure it happened at least three times. BS said her mother did not disclose to her why she was being interviewed when she was taken to the MCSO in March 2022 with ES. She did not make any disclosures to Detective Davison at her first forensic interview because "[a]t the time I was still in that 'I don't want to tell anyone about it.' I thought about it, but I didn't tell him." Detective Davison also did not ask BS any direct questions about whether or not Smith touched her inappropriately. After the first forensic interviews and moving out, the girls began seeing a counselor. In the summer of 2022, Spooner, upon the recommendation of BS's counselor, disclosed to BS what Smith had done to ES and why the girls moved away. During this conversation, BS shared Smith also sexually assaulted her. Detective Davison was notified, and conducted a second forensic interview in June 2022, where BS disclosed everything Smith did to her, but could not recall the details of each specific instance chronologically. On cross examination, defense counsel revealed BS also took Singulair and Flonase.

---

Spooner believed what Smith did was inappropriate, but did not believe there to be anything sexual about it.

[6] Defense counsel confronted ES with the medical record from the pediatrician visit in February 2019 that stated "Reports mucusy [sic] vaginal discharge."

## D. SMITH'S TESTIMONY

Smith testified as the only witness for the prosecution. Smith was a registered nurse. He testified he was a strict parent and Spooner was more "hands off," and they disagreed on how to raise their daughters. Smith believed ES was too young to have a cell phone at 10 years old because "I didn't want my daughter being on the internet with free (unintelligible) to look at whatever she wants," and that he took ES's phone away for "over a year" when she was 10 years old because she was looking at pornography.

Smith said ES began having growing pains in 2019 in her "hips; her buttocks; her legs, front and back; her knees; her—she—even one of her ankles was poppin', makin' noise, and hurtin' her." He gave her Motrin to treat the pain. He testified that the children's pediatrician suggested at the February 8, 2019 visit[7] "that we rubbed her," or "[m]assage the muscles that hurt her." The pediatrician also said ES had neurocardiogenic syncope causing dizziness and fainting and, according to Smith, the treatment for that was also massages. Smith said he massaged the areas that hurt ES for a 10-day period in 2019, and the pain stopped. Smith also gave BS massages because "I guess she wanted rubbed." . . . "[S]he felt left out."

When defense counsel asked whether he ever checked ES for discharge, Smith said "[ES] had absolutely atrocious personal hygiene." . . . "Absolutely—I mean, it was like having a little boy." Checking for discharged involved "her standing in front of me and my wife, so that we could see what was going on." Smith denied ever putting his finger in ES's vagina, and said he only massaged her for a medical purpose. He denied ever touching his daughters in a sexual way. Finally, Smith testified he was now aware that the side effects of Singulair are "depression, vivid dreams, bad dreams, hallucinations. . . . All kinds of [] mood disorders, attitude disorders—." If he had been aware of these side effects earlier, he would not have allowed his daughters to continue taking Singulair.

During cross examination, the prosecutor asked whether Smith took away ES's cell phone because he did not want her communicating to her friends about what Smith was doing to her, or because he did not want her to access pornography so she would not understand what Smith was doing to her. Smith denied these theories. Regarding Singulair, the prosecutor pointed out that Smith, who was a nurse, was never concerned about the side effects of Singulair when ES was prescribed it. Regarding checking ES for discharge, Smith said he only did this once. Smith also admitted to the prosecutor that he massaged ES's hips, buttocks, hamstrings, quads, calves, feet, and sometimes her back and shoulders. When defense counsel asked why Smith massaged ES's buttocks, he replied: "The gluteus maximus is the largest muscle in the human body. . . . And if you want to relieve the pain into it, you gotta work your palm into it. That's it." This concluded trial testimony. Defense counsel's closing argument began the same way his opening statement

---

[7] Smith testified he was not at this appointment and never mentioned vaginal discharge to the pediatrician. Spooner said she remembered being at this appointment, but did not remember whether Smith was with her or whether she called Smith during the appointed and he appeared by telephone.

began: "This case is a case about parenting, outside influences, and the face of a failed marriage, and a failed investigation."

## E. JURY INSTRUCTIONS AND VERDICT

The trial court informed the attorneys that it intended to read M Crim JI 20.1 for CSC-I and M Crim JI 20.3 for CSC-II, as well as M Crim JI 20.3b as to count 1, regarding special findings of the ages of the respective parties. Defense counsel requested that part of the CSC-II instructions that define "sexual act" should be read as to CSC-I, "because, I mean, it does say 'sexual act,' but—or maybe have a second section that just says the sexual act is this." The prosecutor objected and the trial court denied defense counsel's request, stating it would read M Crim JI 20.1 as is.

The jury began deliberating at 3:14 p.m. on the second day of trial. They were called back into the court room after an hour and 15 minutes of deliberating, and were instructed to return at 8:30 a.m. on the third day of trial to continue deliberating. On the third day of trial, the jury returned to the court room at 8:30 a.m. and exited to deliberate at 8:37 a.m. They returned to the court room at 8:42 a.m. and asked the judge if they could "see transcripts and/or video of" ES's, BS's, and Smith's testimony. The trial court told the jury that there was no transcript or video of the testimony available to review, and that jurors would have to rely on their collective memory as they continued deliberating.

The jury exited the court room to continue deliberations at 8:48 a.m. At 10:30 a.m., the jury informed the trial court that it had reached a verdict: guilty on counts 1-4, and not guilty on counts 5-7. At defense counsel's request, the jury was polled, and each juror attested this was their verdict. On April 4, 2024, Smith was sentenced to 25 to 40 years imprisonment for the CSC-I conviction, as well as 5 to 15 years (60 months to 180 months) imprisonment for each CSC-II conviction, to run concurrently, with credit for 75 days served. Smith now appeals his convictions.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Smith argues his counsel was ineffective for: (a) failing to use four remaining peremptory challenges to dismiss three jurors who disclosed they were either victims of sexual assault, or whose family members were victims of sexual assault; (b) failing to call an expert witness to testify that the forensic interview protocol was not followed during ES's forensic interview, and that the trial court should have sua sponte stricken the testimony of the detective on the case; and (c) failing to call an expert witness to testify as to the side effects of Singulair.

"Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 460 NW2d 246 (2002). Findings of fact are reviewed for clear error and questions of constitutional law are reviewed de novo. *Id*. To establish a claim for ineffective assistance of counsel, a defendant must "show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Horn*, 279 Mich App 31, 37-38 n 2; 755 NW2d 212 (2008) (citation omitted); see also *Strickland v Washington*, 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Smith argues defense counsel was ineffective for failing to use his peremptory challenges to remove jurors who may have been biased against the defense. He also argues that the entire venire was prejudiced by certain jurors' responses to questions. The latter claim lacks merit on its face. First, eliciting personal and familial history with sexual assault from prospective jurors was necessary to determine whether they should be excused and was therefore permissible. *People v Bell*, 209 Mich App 273, 277-278; 530 NW2d 167 (1995). Second, Smith fails to cite, and we are unable to find, anything in the record said by a potential juror that was so inflammatory as to have prejudiced his case. Given there is no evidence to support that the jury venire was tainted, defense counsel's failure to request the entire jury venire be dismissed did not constitute ineffective assistance of counsel. We next consider defense counsel's failure to exercise all available peremptory challenges.

### A. DEFENSE COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO USE FOUR REMAINING PEREMPTORY CHALLENGES

Smith argues there was no sound trial strategy to allow Jurors 3, 115, and 122 to remain on the jury, and that defense counsel's failure to use his remaining four peremptory challenges constituted ineffective assistance of counsel. We disagree.

Under MCR 6.412(E)(1) and MCL 768.13, a defendant is entitled to 12 peremptory challenges when charged with an offense punishable by life imprisonment, such as CSC-I. Unlike dismissals for cause, peremptory challenges are discretionary strikes that do not require a legally cognizable reason for juror dismissal. "[A]n attorney's decisions relating to the selection of jurors generally involve matters of trial strategy." *People v Johnson*, 245 Mich App 243, 259; 631 NW2d 1 (2001). A trial attorney has the opportunity to view "a potential juror's facial expressions, body language, and manner of answering questions," which are important criteria in selecting a jury. *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008). Choosing a jury based on observations and hunches may be as valid as any other method of jury selection. *Id*. Because we "cannot see the jurors or listen to their answers to voir dire questions," we are "disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror." *Id*. (internal citations omitted).

Juror 115 disclosed she was "sexually assaulted twice; once when I was 18 and when I was 22." The prosecutor asked whether there was anything about those experiences that would affect her ability to be fair and impartial, and she responded "no." Without revealing her relationship to the person who assaulted her, Juror 115 went on to serve on the jury. Juror 122, explained his mother-in-law had been a victim of sexual abuse by a friend, and that his "wife is a (inaudible) of sexual assault (inaudible)." Juror 122 also answered "no" when asked whether there was anything about those relationships that would affect his ability to be fair and impartial. Both jurors swore that they could try the case justly. And all jurors swore that they would "justly decide the questions submitted" to them, and would "render [their] verdict only in the evidence introduced with the instructions of the [c]ourt." Michigan caselaw directs us to presume jurors follow their instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and that we accept their oath of impartiality as true. *Johnson*, 245 Mich App at 256. Defense counsel's failure to dismiss Jurors 115 and 122 could have been strategy, and "[t]he fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Steward*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

However, unlike Juror 115 and Juror 122, we doubt whether allowing Juror 3 to serve on the jury was sound trial strategy. Juror 3 disclosed her step-daughter was sex-trafficked for five years, and when asked if she could be fair and impartial, she responded: "I'll give it my all. It—it's difficult to let go of that. We just got her back." The prosecutor further inquired, "[D]o you understand the defendant has a right to a fair trial here" and Juror 3 responded "I do." The prosecutor then asked "And can you separate the facts of this case and follow the instructions of the Judge independently of the situation involving your step-daughter?" Juror 3 responded "I believe so."

Stating "I believe so" is different than stating a firm "yes" when asked whether one can be fair and impartial. And while we were not there to view Juror 3's "facial expressions, body language, and manner of answering questions," *Unger*, 278 Mich App at 258, reviewing the transcript of voir dire, Juror 3 reads as being unsure about whether she could be fair and impartial. Arguably, defense counsel's failure to dismiss Juror 3 fell below an objective standard of reasonableness. *Strickland*, 466 US at 687-688.

But even so, there is no reasonable probability that if Juror 3 or any other juror was dismissed, the outcome of Smith's trial would have been different. *Strickland*, 466 US at 687-688. First, Smith's supplemental brief presents no substantive argument that the outcome of his trial would have been different. But the record contains evidence of the opposite, that the jury carefully considered the facts and the law and rendered a fair and impartial verdict. While jurors were unable to review the requested testimony of Smith, ES, and BS, the trial court was careful not to force a verdict. The trial court deliberately dismissed the jury half an hour earlier than planned on the second day of trial, and compelled the jury to return on the third day of trial to, in its own words, prevent the jury from rushing to reach a unanimous verdict before 5:00 p.m. on the second day of trial so they would not have to return for a third day. Further, each juror was polled after reaching a verdict, and each said this was their verdict. Finally, the jury did not wholesale find Smith guilty on every count. He was acquitted on charges as to BS, evidencing the jury was meaningfully engaged, thoughtful about the testimony, and was carefully considering the facts, the law, and the evidentiary burden the prosecution was required to meet. On this record, we cannot conclude there is a reasonably probability that had defense counsel dismissed Juror 3 during voir dire, the outcome of this trial would have been different. Thus, defense counsel was not ineffective in opting not to use his four remaining peremptory challenges.

## B. THE FORENSIC INTERVIEW AND DETECTIVE DAVISON'S TESTIMONY

Next, Smith argues Detective Davison's testimony was unreliable because he failed to follow forensic interview protocol when interviewing ES and BS, defense counsel should have moved to strike the testimony, the trial court erred for failing to sua sponte strike the testimony, and as a result, Smith was denied his constitutional right to a fair trial. Smith alternatively argues that defense counsel was ineffective for failing to call an expert witness on forensic interview protocol to challenge the methods by which Detective Davison interviewed ES. We disagree with these arguments.

A defendant must object to "error[s] of constitutional magnitude" in order to preserve them for appellate review. *People v Carines*, 460 Mich 750, 761; 597 NW2d 130 (1999); see also *People*

*v Jones*, 468 Mich 345, 355; 662 NW3d 376 (2003).[8] Defense counsel did not move to strike Detective Davison's testimony, so whether Smith was denied a fair trial as a result of the jury hearing the testimony is unpreserved. We review unpreserved constitutional issues for plain error affecting the defendant's substantial rights. *Carines*, 460 Mich at 763.[9] Plain error exists when "1) [an] error . . . occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* Even after these prongs are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error ' "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence.' " *Id*. quoting *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

### 1. DETECTIVE DAVISON FOLLOWED FORENSIC INTERVIEW PROTOCOL AND DEFENSE COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO MOVE TO STRIKE THE TESTIMONY

Michigan's forensic interviewing protocol is a set of interviewing procedures designed to investigate child abuse and sexual abuse while minimizing the risk of manipulation by the interviewer. See Russell, *Documentation and Assessment of Children's Forensic Interview Statements*, 16 Widener L Rev 305, 307 n8 (2010). When interviewing a child to obtain evidence of abuse or neglect, law enforcement must adopt and implement interview protocols using the model developed by the governor's task force on children's justice. MCL 722.628(6). The DHHS Publication in effect in March 2022 when Detective Davison interviewed ES was FIA Publication 799, revised in October 2017.[10]

However, Michigan law does not mandate automatic reversal of a conviction when law enforcement fails to follow forensic interview protocol:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter

---

[8] This is raised as a due process issue but is substantively more about whether evidence was erroneously admitted. "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001); MRE 103(a)(1).

[9] As stated in footnote 8, because this issue is more about whether evidence was erroneously admitted, we review a trial court's decision to admit evidence for an abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). Under either standard of review, we conclude below that the protocol appears to have been followed and the testimony was admissible.

[10] Michigan Department of Health and Human Services and Governor's Task Force on Child Abuse and Neglect, *Forensic Interviewing Protocol, 4th Ed.* Pub-799 (10-2017) <https://www.michigan.gov/mdhhs/-/media/Project/Websites/mdhhs/Adult-and-Childrens-Services/Abuse-and-Neglect/Childrens-Protective-Services/DHS-PUB-0779-Fourth-Edition.pdf?rev=b91c495ea62046219ace84d25863ece1&hash=D38F237703D7919BDD776334 0F826F4D> (accessed February 2, 2026).

of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. [MCL 769.26(1).]

This harmless error standard requires the defendant to demonstrate actual prejudice from an alleged violation of the protocol.

First, it appears Detective Davison followed forensic interview protocol. Smith argues ES's forensic interview was conducted in a police station, which was "far from ideal." But the protocol states "the best environment for conducting forensic interviews is a center specifically equipped for this purpose," and if interviewers do not have access to an interviewing facility, they should "select the most neutral location possible." The protocol acknowledges that "children may worry about being interviewed in a police station, and thus they might benefit from an explanation about why they are being interviewed there (e.g., 'We like to talk to children over here because the rooms are nice and bright, and we won't be disturbed')." *Forensic Interviewing Protocol, 4th Ed*, p 4. Here, ES's forensic interview was conducted at the MCSO in the "first floor interview room," a location specifically designated for forensic interviews. Detective Davison told Spooner not to talk to ES about anything that was going to be discussed, and spoke with ES outside the presence of Spooner and BS, while a Department of Health and Human Services (DHHS) worker watched the interview via a closed circuit television in a separate room away from Detective Davison, ES, BS, and Spooner. It is unclear, and Smith does not argue, what could have been done differently to ensure the forensic interview was conducted in a more suitable environment.

Smith also argues that Detective Davison failed to test alternative hypotheses for ES's statements during the interview that Smith sexually assaulted her. The forensic interview protocol directs interviewers to prepare for the forensic interview by "generating a set of alternative hypotheses about the source and meaning of the allegations" including "[q]uestions to test alternative hypotheses about how the allegations arose" and "[q]uestions to test alternative interpretations of words the child uses to describe important event details []." *Forensic Interviewing Protocol, 4th Ed*, p 9.

For example, if there is an allegation that a babysitter touched a child in a sexual way, an alternative hypothesis is that the touching occurred during routine caregiving (such as wiping after a bowel movement). In this case, after the child states that he or she was touched on the butt by the babysitter, the question "What were you doing when the babysitter touched you on the butt?" could be the first of a series of questions to determine if the babysitter was cleaning the child. [*Forensic Interviewing Protocol, 4th Ed*, p 9-10.]

Here, Detective Davison said he did not recall whether he asked if ES was having disciplinary issues with either parent, and admitted he did not ask whether ES had medical issues other than growing pains, or whether she was on any medications. However, ES disclosed during the interview that Smith massaged her for growing pains, so ES provided an alternative hypothesis. Detective Davison inquired who else massaged ES besides Smith, and she revealed Spooner also massaged her for growing pains. Detective Davison probed ES on whether this could all have been a dream and not something that really happened. It appears from this record that Detective Davison did explore alternative hypotheses for the allegations of sexual assault.

Detective Davison's testimony also established that he began ES's interview by stating the four ground rules for forensic interviews, which are, to quote the protocol: (1) "don't guess at answers," (2) "[t]ell me if you don't understand something I say," (3) [c]orrect me if I make a mistake," and (4) "tell the truth." *Forensic Interviewing Protocol*, 4th Ed, p 12. When asked whether he conducted a practice narrative to identify whether ES was capable of identifying the difference between the truth and a lie as required by the protocol, see *id*. at p 13-14, Detective Davison answered that he did not recall whether or not he conducted one, not that he affirmatively did not conduct one.

Whether the interviewer received training in forensic interview protocol, how many interviews they previously conducted, and how and why they developed the questions and hypotheses they used during the interview, are"[valuable] to a fact-finder trying to determine the weight and credibility of the victim's account of the charged offenses." *People v Tesen*, 276 Mich App 134, 144; 739 NW2d 689 (2007). Defense counsel's cross examination of Detective Davison sufficiently communicated all of this information, and any potential errors in the forensic interview for the jury to consider when weighing the evidence. But on this record, it appears the protocol was followed and no due process violation occurred, and that there was no evidentiary issue in allowing Detective Davison to testify. ES testified at trial about Smith's sexual abuse and the transcript of her forensic interview was not used to bolster her credibility or to establish the facts. Instead, the forensic interview was only mentioned by the prosecutor as part of the police investigation and as to the addition of BS's charges against Smith. Accordingly, defense counsel was not ineffective for failing to move to strike Detective Davison's testimony, and the trial court could not have plainly erred by failing to sua sponte strike the testimony.

## 2. DEFENSE COUNSEL WAS NOT INEFFECTIVE FOR NOT CALLING AN EXPERT ON FORENSIC INTERVIEW PROTOCOL

"In general, the failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (cleaned up). In *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), defense counsel was deemed ineffective for failing to obtain an expert witness. In that case, defense counsel consulted with an expert who told him that he did not agree with his defense theory and suggested that he speak with a specific expert who was both highly qualified and would likely be able to support the defense theory. *Id*. at 385-386. Despite this advice, the defendant's lawyer failed to consult any other experts and did not call any expert in support of the defense theory at trial. *Id*. at 384-387. Our Supreme Court determined that defense counsel's knowledge of the existence of an expert who could possibly support the defense theory rendered his decision to confine his pursuit of expert assistance only to one expert with an opposing viewpoint unreasonable because it left the defense theory without objective, expert testimonial support. *Id*. at 392. The Court similarly concluded that defense counsel's failure to educate himself on the medical issues that were central to the case prevented him from making an informed choice

regarding his pursuit of expert assistance and left him insufficiently equipped to challenge the prosecution's experts. *Id*.[11]

Here, we do not know whether defense counsel consulted an expert on the forensic interview protocol or what his strategy was for opting not to call an expert. But defense counsel sought and obtained the interview video as evidenced by the trial court order, by stipulation of the parties, to release ES and BS's child forensic interview videos. At the very least, it is clear defense counsel reviewed the video of ES's forensic interview, compared it to the forensic interview protocol, and cross-examined Detective Davison on the alleged deficiencies in his interview. This issue was sufficiently presented to the jury as one of the defense's theories.

Further, it is unclear what an expert on forensic interview protocol would provide to the jury. The purpose of such an expert would be to reveal deficiencies in the forensic interview, but given it appears the protocol was followed, there would have been no purpose for this expert. Defense counsel's decision to not call an expert on forensic interview protocol, and to not admit the protocol into evidence, was a matter of trial strategy and "[w]e will not substitute our own judgment for that of counsel on matters of trial strategy . . . ." *Payne*, 285 Mich App at 190 (citation omitted). Defense counsel was not ineffective in this regard.

## C.  DEFENSE COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO CALL AN EXPERT WITNESS TO TESTIFY ABOUT THE SIDE EFFECTS OF SINGULAIR

Finally, Smith argues defense counsel was ineffective for failing to present expert testimony concerning the possible side effects of Singulair.[12] We disagree.

As stated above, the failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *Payne*, 285 Mich App at 190 (cleaned up). However, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Smith does not argue on appeal how defense counsel's performance fell below an objective standard of reasonableness for failing to call an expert witness regarding Singulair, or whether this was outcome determinative. *Strickland*, 466 US at 487-688. In any case, defense counsel was effectively able to introduce the many side effects of Singulair through examining witnesses.

---

[11] See also *Trakhtenberg*, 493 Mich at 54 n 9 (a defense attorney may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand).

[12] The addendum to Smith's brief on appeal is a one-page drug label from the FDA for Singulair, which was not presented to the jury. As we have explained, "to consider evidence presented on appeal that the parties failed to present to the trial court would be an impermissible expansion of the lower-court record." *People v Morrison*, 328 Mich App 647, 655; 939 NW2d 728 (2019), citing MCR 7.210(A). We do not consider the addendum in deciding this issue.

Defense counsel cross-examined Spooner on whether she was aware of the side effects of Singulair, and she responded "no." The following exchange occurred:

> *Defense counsel.* Are you aware that it can cause aggression?
>
> *Spooner.* No.
>
> *Defense Counsel.* Are you aware that it can cause disturbances?
>
> *Spooner.* No.
>
> *Defense Counsel.* Are you aware that it can cause suicidal thoughts?
>
> *Spooner.* No.
>
> *Defense counsel.* Are you aware that it can cause vivid dreams or nightmares?
>
> *Spooner.* No.
>
> *Defense Counsel.* Are you aware that it can cause mood changes or irritability?
>
> *Spooner.* No.
>
> *Defense Counsel.* Or depression?
>
> *Spooner.* No.

Smith also testified for the defense that the side effects of Singulair were "depression, vivid dreams, bad dreams, hallucinations. . . . All kinds of [] mood disorders, attitude disorders," and that had he known this, he would not have allowed ES to take Singulair. On cross examination, the prosecutor asked Smith why, if he was an RN of 17 years and was aware that all drugs had side effects, he was not concerned with ES taking Singulair. But ES testified she never experienced any psychological effects from taking Singulair. As a result, defense counsel may have felt an expert on Singulair would not meaningfully add to the defense.

But even if failing to present an expert witness on the side effects of Singulair fell below an objective standard of reasonableness, we are not convinced an expert on Singulair would have changed the outcome of trial. That is because the jury heard from Smith and Spooner on the possible side effects of Singulair. ES testified clearly to one instance of CSC-I, three instances of CSC-II, and the jury made a credibility determination that we decline to disturb. On this record, defense counsel was not ineffective for opting not to call an expert witness on the side effects of Singulair.

## III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED DEFENSE COUNSEL'S REQUEST TO DEFINE "SEXUAL CONDUCT" FOR THE CSC-I CHARGE

Finally, Smith argues the trial court abused its discretion when it denied defense counsel's request to define "sexual conduct." We disagree.

Preserved "[c]laims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Bass*, 317 Mich App 241, 256; 893 NW2d 140 (2016) (quotation marks and citation omitted).

Defendants have a right to a properly instructed jury. *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022). Jury instructions must contain all elements of the crime and should not exclude material issues or defenses that are supported by evidence. *Id*. at 35. The instructions must clearly present the applicable law. *People v McKinney*, 258 Mich App 157, 162; 670 NW2d 254 (2003). However, even if the instructions were imperfect, reversal is not required so long as the instructions fairly presented the issues and were sufficient to protect the defendant's rights. *People v Fennell*, 260 Mich App 261, 265; 677 NW2d 66 (2004). This Court will reverse a verdict or order a new trial if "after reviewing the record, it appears to this Court that the error resulted in a miscarriage of justice." *People v Bartlett*, 231 Mich App 139, 143 (1998). "A miscarriage of justice, or manifest injustice, occurs when an erroneous or omitted instruction pertained to a basic and controlling issue in the case." *Id*. at 144.

Defense counsel requested an instruction that further defined a "sexual act" in the final jury instructions for CSC-I, arguing the model instruction the judge intended to read assumed that any sort of penetration was automatically a sexual act. The prosecution objected, arguing whether Smith committed a sexual act was an issue for the jury to decide. The prosecution highlighted that the language of M Crim JI 20.1 includes the act that took place, that is "entry into [ES]'s genital opening by the defendant's finger." The trial court agreed that it was up to the jury to decide whether this was a sexual act, and went on to read the following instruction to the jury, modeled after M Crim JI 20.1(2)(a):

> The defendant is charged in count 1 with criminal sexual conduct, first degree. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt: First, that the defendant engaged in a sexual act that involved entry into [ES]'s genital opening by the defendant's finger. Any entry, no matter how slight, is enough.

Although "sexual conduct" is not defined in the model instruction, sexual penetration is defined by MCL 750.520a(r) to mean "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." The instruction adequately encompasses this definition of sexual penetration. "Sexual contact" is defined by MCL 750.520a(q) as:

the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for:

(i) Revenge.

(ii) To inflict humiliation.

(iii) Out of anger.

However, our Supreme Court in *People v Lemons*, 454 Mich 234, 253-254; 562 NW2d 447 (1997) made clear that CSC-II, which involves sexual contact rather than sexual penetration, requires "proof of intent not required" by CSC-I, that "defendant intended to seek sexual arousal or gratification." *Lemons* further stated that it is possible to commit CSC-I without committing CSC-II. *Id*. *Lemons* also stated that the sexual penetration requisite for a conviction of CSC-I "can be for any purpose." *Id*. at 253. On the basis of *Lemons*, defense counsel's requested instruction would be adding an intent element not required to convict Smith of CSC-I. Had the trial court granted his request, this would have been an abuse of discretion.

Further, the jury instructions clearly presented the elements of CSC-I, and contrary to Smith's argument, left open the possibility that the jury could find Smith put his finger into ES's vaginal opening for a medical, nonsexual purpose. But ES's testimony allowed the jury to reach the conclusion that the touching was done for a sexual purpose. ES testified that before Smith put his finger in her vaginal opening, he was talking to her about sex and said, "I don't understand why God made sex a sin because it's so enjoyable." ES also testified Smith showed her diagrams of female anatomy and erogenous zones for women, and put lube on his finger before placing it in her vaginal opening. While his finger was inserted in ES's vaginal opening, ES said Smith was laughing at her. After removing his finger from ES's vaginal opening, ES testified Smith said that she would be perfect for her husband. The jury could deduce from this evidence without further instruction that Smith committed a sexual act. The trial court did not abuse its discretion in denying defense counsel's request for a definition of "sexual act" in the jury instructions.

## IV. CONCLUSION

We affirm Smith's convictions because he was not denied his constitutional right to a fair trial, his trial defense counsel was not ineffective, and the trial court did not abuse its discretion in denying defense counsel's request for a specific jury instruction.


/s/ Thomas C. Cameron
/s/ Michael J. Kelly
/s/ Adrienne N. Young